**FILED**

JUN 0 8 2010

Clerk, U.S. District and
Bankruptcy Courts

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

In re Application of

**CHEVRON CORPORATION,**

Applicant,

To Issue a Subpoena for the Taking of a
Deposition and the Production of Documents.

Misc. Action No. _____

Case: 1:10-mc-00371
Assigned To : Kollar-Kotelly, Colleen
Assign. Date : 6/8/2010
Description: Miscellaneous

## APPLICATION FOR (1) AN ORDER PURSUANT TO 28 U.S.C. § 1782 TO CONDUCT DISCOVERY FOR USE IN FOREIGN PROCEEDINGS, AND (2) AN ORDER TO SHOW CAUSE WHY A SUBPOENA SHOULD NOT IMMEDIATELY ISSUE

Based upon the concurrently filed Memorandum of Points and Authorities and

Declaration of Louis K. Fisher, Chevron Corporation ("Chevron") applies to this Court for an

Order, pursuant to 28 U.S.C. § 1782, and Rules 26, 30 and 45 of the Federal Rules of Civil

Procedure, granting Chevron leave to serve the subpoena attached to the Fisher Declaration as

Annex A. Chevron further requests an Order to Show Cause why the subpoena should not

immediately issue, due to the significant time exigencies here.

### I.      THE APPLICATION IS JUSTIFIED

The requested relief is for the purpose of obtaining limited, but necessary, discovery in

connection with two proceedings currently pending before foreign tribunals: *Maria Aguinda y*

*Otros v. Chevron Corporation,* a suit against Chevron pending in the Provincial Court of Justice

of Sucumbíos in Lago Agrio, Ecuador (the "Lago Agrio Litigation"); and *Chevron Corporation*

*and Texaco Petroleum Company v. Republic of Ecuador,* an international arbitration filed by

Chevron and Texaco Petroleum Company against the Republic of Ecuador pursuant to Article

VI(3)(a) of the Bilateral Investment Treaty between the United States of America and the

Republic of Ecuador (the "Treaty Arbitration"). The Treaty Arbitration relates, in part, to the Republic of Ecuador's improper conduct vis-à-vis the Lago Agrio Litigation.

The party to be subpoenaed is Norman Nelson Alberto Wray Espinosa ("Wray"). As discussed in the Memorandum of Points and Authorities filed concurrently herewith, Wray filed the complaint in the Lago Agrio Litigation in 2003 and was the plaintiffs' lead Ecuadorian counsel until February 2006, when he relinquished primary responsibility for the case. *See* Mem. in Supp. of Application for an Order Under 28 U.S.C. § 1782 Permitting Chevron to Issue a Subpoena 6-7, 10-12. Wray is likely to have evidence of misconduct in that litigation by representatives of the Lago Agrio plaintiffs, including the submission of falsified expert reports, and he also is likely to have evidence of collusion between representatives of the Lago Agrio plaintiffs and the Government of Ecuador, which is highly relevant to key issues in both the Lago Agrio Litigation and the Treaty Arbitration. *Id.* at 8-16.

Chevron is a party, and is thus an "interested person" under Section 1782, in both the Lago Agrio Litigation and the Treaty Arbitration, and it seeks discovery here for "use in" those proceedings. *Id.* at 15-16. Wray is "found" within this district. *Id.* at 15. Chevron thus meets all the statutory criteria for the issuance of an order allowing the discovery. 28 U.S.C. § 1782. In addition, all the discretionary factors that this Court may consider also favor granting the Petition. *Id.* at 17-22 (citing *Intel Corp. v. Advanced Micro Devices, Inc.,* 542 U.S. 241, 264-65 (2004)).

To date, four federal district courts have granted Chevron's applications pursuant to Section 1782 for discovery from other witnesses for use in one or both of the same proceedings.

> ➢ On March 3, 2010 the United States District Court for the Northern District of Georgia granted Chevron's Section 1782 application seeking discovery from Dr. Charles

Calmbacher, one of the plaintiffs' experts in the Lago Agrio Litigation. (Ex. 1 (Order, *In re Application of Chevron Corp.,* Case No. 1:10-MI-0076 (N.D. Ga. March 2, 2010)).)[1] Pursuant to the Court's order, Dr. Calmbacher was deposed on March 29, 2010 and testified that he neither drafted, nor reached the conclusions in, nor authorized the filing of, two expert reports submitted by the Lago Agrio plaintiffs in his name. (*See* Ex. 24 at 112:1-117:20 (Calmbacher Deposition).)

➢ On March 4, 2010, the United States District Court for the District of Colorado granted Chevron's application seeking discovery from Stratus Consulting, an environmental consulting firm retained by counsel for the plaintiffs. (Ex. 58 (Hearing Tr., *Chevron* v. *Stratus Consulting, Inc.,* Case No. IO-CY-00047 (D. Colo. Mar. 4, 2010)).) Through those proceedings and the resulting discovery, Chevron has obtained evidence that representatives of the Lago Agrio plaintiffs secretly provided materials to a supposedly neutral court expert for use in his report and likely wrote significant portions of that report. Plaintiffs have also admitted in that proceeding to having had ex parte contact with the Ecuadorian court's "neutral" damages expert.

➢ On April 5, 2010, the United States District Court for the Southern District of Texas granted Chevron's application seeking discovery from 3TM Consulting, LLC, another of plaintiffs' environmental consultants. (Ex. 53 (Order, *In re Application of Chevron Corp.* Misc. No. 4:10-MC-134 (S.D. Tex. April 5, 2010)).)

➢ On May 6, 2010, the United States District Court for the Southern District of New York granted Chevron's application seeking discovery from Joseph Berlinger, producer of the movie *Crude.* (Ex. 51 (Mem. Op. and Order, *In re Application of Chevron Corp.,* Case No. M-19-111 (S.D.N.Y. May 10, 2010)).) The court noted that the filmmakers conceded that they had altered the release version of the film at plaintiffs' counsel's request; specifically, they deleted frames showing a key member of the supposedly neutral court expert's team at a meeting alongside the plaintiffs' lawyers. (*Id.* at 10.)

Chevron anticipates that it will obtain additional evidence of misconduct and other highly relevant evidence as the discovery authorized in those proceedings continues.

## II.   THE APPLICATION IS URGENT

The discovery sought through this Application is urgent. As noted by the Southern District of New York in another Section 1782 proceeding, "[t]he Lago Agrio Plaintiffs are pushing the Ecuadorian court to close the evidentiary phase of that litigation and immediately enter a multibillion dollar judgment against Chevron, thus preventing Chevron from placing

---

[1] All exhibits cited herein are to the Fisher Declaration filed herewith.

before that court the likely relevant evidence contained in the [discovery sought]. Those Plaintiffs intend, if they succeed, to attempt to enforce such a judgment around the world." (Ex. 59 (Order, *In re Chevron Corporation,* S.D.N.Y. Case No. M-19-111 (S.D.N.Y. May 20, 2010)).) In the Treaty Arbitration, too, time is of the essence. Chevron will be irreparably harmed if, prior to an arbitral decision, the Lago Agrio plaintiffs obtain a judgment and begin enforcement proceedings as referenced above. Accordingly, the Tribunal has set an ambitious briefing schedule, with a deadline of September 6, 2010, for Chevron's Opening Memorial on the Merits, which is meant to include a full evidentiary submission. (Ex. 60 at 152 (Hearing Transcript, May 11, 2010, *Chevron Corporation And Texaco Petroleum Company v. The Republic Of Ecuador,* UNCITRAL Arbitration, PCA Case No. 2009-23).)

In light of these exigencies, Chevron is providing immediate notice of the application to Wray, to counsel for the Lago Agrio plaintiffs, and to counsel for the Republic of Ecuador. To insure that any objections to the application can be presented to this Court promptly, Chevron also seeks an order to show cause why the Section 1782 application should not be immediately granted. Chevron just last week made a similar scheduling request along with a Section 1782 application in the District of New Jersey, and that court set an expedited briefing schedule culminating in a hearing on the Application within three weeks. (Ex. 61 (Order, *In re Application of Chevron Corporation,* Case No. 10-2675 (SRC) (D.N.J., May 26, 2010).) Chevron respectfully requests that this Court similarly expedite this Application.

Dated:  June 8, 2010

THOMAS F. CULLEN, JR., D.C. Bar No. 224733
TFCullen@jonesday.com
LOUIS K. FISHER, D.C. Bar No. 475502
LKFisher@jonesday.com
LUKE A. SOBOTA, D.C. Bar No. 477935
LASobota@jonesday.com
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C.  20001-2113
Telephone: 202.879.3939
Facsimile: 202.626.1700

ANDREA E. NEUMAN, Cal. Bar No. 149733,
*pro hac vice pending*
ANeuman@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
3161 Michelson Drive
Irvine, CA 92612-4412
Telephone: 949.451.3800
Facsimile: 949.451.4220

THOMAS G. HUNGAR, D.C. Bar No. 447783
THungar@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
Telephone: 202.955.8500
Facsimile: 202.467.0539

Attorneys for Chevron Corporation

# ANNEX A

AO88 (Rev. 12/06) Subpoena in a Civil Case

**Issued by the**

# UNITED STATES DISTRICT COURT

### DISTRICT OF COLUMBIA

In re Application of CHEVRON CORPORATION

V.

**SUBPOENA IN A CIVIL CASE**

Case Number:[1]

TO:   Norman Nelson Alberto Wray Espinosa

☐ YOU ARE COMMANDED to appear in the United States District court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| | DATE AND TIME |

☑ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION   Jones Day, 51 Louisiana Ave. N.W., Washington, DC 20001 (See Ex. B) | DATE AND TIME |
|---|---|

☑ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

See Exhibit A to this Subpoena

| PLACE       Jones Day, 51 Louisiana Ave. N.W., Washington, DC 20001 | DATE AND TIME |
|---|---|

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
|---|---|
| | 6/8/2010 |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
Louis K. Fisher, Attorney for Chevron Corporation
51 Louisiana Avenue N.W., Washington, DC 20001, (202) 879-3939

(See Rule 45, Federal Rules of Civil Procedure, Subdivisions (c), (d), and (e), on next page)

[1] If action is pending in district other than district of issuance, state district under case number.

AO88 (Rev. 12/06) Subpoena in a Civil Case

## PROOF OF SERVICE

| | DATE | PLACE |
|---|---|---|
| SERVED | | |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|
| | |

| SERVED BY (PRINT NAME) | TITLE |
|---|---|
| | |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____
               DATE

_____
SIGNATURE OF SERVER

_____
ADDRESS OF SERVER

Rule 45, Federal Rules of Civil Procedure, Subdivisions (c), (d), and (e), as amended on December 1, 2006:

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction, which may include, but is not limited to, lost earnings and a reasonable attorney's fee.

(2) (A) A person commanded to produce and permit inspection, copying, testing, or sampling of designated electronically stored information, books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d)(2) of this rule, a person commanded to produce and permit inspection, copying, testing, or sampling may, within 14 days after service of the subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to producing any or all of the designated materials or inspection of the premises — or to producing electronically stored information in the form or forms requested. If objection is made, the party serving the subpoena shall not be entitled to inspect, copy, test, or sample the materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production, inspection, copying, testing, or sampling. Such an order to compel shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection, copying, testing, or sampling commanded.

(3) (A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i) fails to allow reasonable time for compliance;

(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c)(3)(B)(iii) of this rule, such a person may an order to attend trial be commanded to travel from any such place within the state in which the trial is held;

(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies; or

(iv) subjects a person to undue burden.

(B) If a subpoena

(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or

(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA.

(1) (A) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(B) If a subpoena does not specify the form or forms for producing electronically stored information, a person responding to a subpoena must produce the information in a form or forms in which the person ordinarily maintains it or in a form or forms that are reasonably usable.

(C) A person responding to a subpoena need not produce the same electronically stored information in more than one form.

(D) A person responding to a subpoena need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or to quash, the person from whom discovery is sought must show that the information sought is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

(2) (A) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial-preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

(B) If information is produced in response to a subpoena that is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has and may not use or disclose the information until the claim is resolved. A receiving party may promptly present the information to the court under seal for a determination of the claim. If the receiving party disclosed the information before being notified, it must take reasonable steps to retrieve it. The person who produced the information must preserve the information until the claim is resolved.

(e) CONTEMPT. Failure of any person without adequate excuse to obey a subpoena served upon that person may be deemed a contempt of the court from which the subpoena issued. An adequate cause for failure to obey exists when a subpoena purports to require a nonparty to attend or produce at a place not within the limits provided by clause (ii) of subparagraph (c)(3)(A).

# EXHIBIT A

## DOCUMENTS TO BE PRODUCED

### DEFINITIONS

1.      "And" includes the word "or" and vice-versa.

2.      "Any" includes the word "all" and vice-versa.

3.      As used herein, the terms "DOCUMENT" or "DOCUMENTS" shall mean all

COMMUNICATIONS in a tangible form, however produced, reproduced, or stored on any

electronic media, and shall include, but shall not be limited to, the following: all records,

memoranda, reports, financial statements, handwritten and other notes, transcripts, papers,

indices, letters, envelopes, telegrams, cables, telex messages, tabulations, work papers,

timesheets, statements, summaries, opinions, journals, desk calendars, appointment books,

diaries, magazines, newspapers, booklets, circulars, bulletins, notices, instructions, manuals,

notes or summaries of telephone conversations or messages or other COMMUNICATIONS of

any type, video recording, photographs, tape or other recordings, punch cards, discs, data cells,

drums, printouts, and other data compilations from which information can be obtained,

electronically-stored information, correspondence, teletype messages, electronic mail, instant

messages, internal memoranda, agreements, diary entries, minute books, financial records,

accounting records, income tax returns, ledgers, journals, audits, receipts, canceled checks, check

stubs, drafts and other written, deeds, leases, mortgages, assignments, insurance policies, or other

instruments related to real or personal property printed or typed matter, diagrams, plans, pictures,

travel, entertainment, or expense records or reports or any other tangible thing that constitutes

matter. The term "DOCUMENT" and "DOCUMENTS" shall also mean originals and exact

copies or reproductions of all such written, printed, typed, recorded or graphic material or matter

upon which notations or markings in writing, print or otherwise have been made which do not appear in the originals.

4.     The term "COMMUNICATION(S)" shall mean the transmittal of any information by any method and includes all meetings, discussions, telephone conversations, contracts, letters, e-mails, memoranda, correspondence, reports, statements, consultations, negotiations, estimates, purchase orders and any DOCUMENT relating thereto.

5.     The phrase "CRIMINAL INVESTIGATION(S)" or "CRIMINAL PROCEEDING(S)" shall refer to all investigations or other proceedings RELATED TO actual or potential criminal accusations or charges RELATING TO the SETTLEMENT AND RELEASE AGREEMENTS, the LAGO AGRIO LITIGATION, THE AGUINDA LITIGATION or the factual allegations therein. This definition includes without limitation all investigations or other proceedings RELATED TO the following documents:

   a.   Comptroller General of Ecuador Genaro Peña Ugalde's Criminal Complaint filed with the Prosecutor General of Ecuador on October 29, 2003

   b.   Prosecutor General Mariana Yépez Andrade's Order Initiating the Preliminary Investigation for Environmental Crimes and Fraud issued on May 10, 2004

   c.   Prosecutor General of Ecuador Cecelia Armas's Motion to Dismiss the Fraud Charges filed in the Criminal Division of the Supreme Court of Ecuador on August 9, 2006

   d.   Public Prosecutor of Pichincha Marianita Vega Carrera's Motion to Dismiss the Environmental Crimes Charges filed in the Third Criminal Court of Napo on September 4, 2006

e.  Order Requesting Comptroller General's Opinion on Prosecutor General Armas's Motion to Dismiss the Fraud Charges issued by the Supreme Court of Justice on October 27, 2006

f.  Prosecutor General Jorge German's Motion to Dismiss Criminal Case filed in Supreme Court of Justice on March 1, 2007

g.  Comptroller General Carlos Polít Faggioni's Motion Requesting that the Criminal Case Remain Open filed in the Supreme Court of Justice on May 18, 2007

h.  Order Requiring Prosecutor General to Reissue Opinion issued by Supreme Court of Justice on June 11, 2007

i.  Prosecutor General Jorge German's Motion to Dismiss Criminal Case filed in Supreme Court of Justice on June 14, 2007

j.  District Prosecutor Washington Pesántez's Opinion Affirming the Motion to Dismiss the Environmental Crimes Charges (March 13, 2007)

k.  Order Dismissing the Environmental Crimes Charges issued by the Third Criminal Court of Napo on March 16, 2007

l.  Prosecutor General Washington Pesántez's Notice Reopening the Investigation for Falsification of Public Documents based on New Evidence issued on March 31, 2008

m.  Prosecutor General Washington Pesántez's Notice Ordering the Initiation of the Prosecutorial Investigation issued on August 26, 2008

n.  Judge Roberto Gómez Mera's Order Noticing the Initiation of the Prosecutorial Investigation issued on September 19, 2008 in the Supreme Court of Justice

o. Prosecutor General Alfredo Alvear Enríquez's Order Adding New Sites to Investigation issued on May 13, 2009

p. Environmental Engineer William Bedón's Expert Report Site Inspection filed with the Prosecutor General's Office on August 25, 2009

q. Prosecutor General Alfredo Alvear Enríquez's Accusation Opinion of Rodrigo Pérez and Ricardo Veiga issued on April 29, 2010

6. The phrase "RELATED TO" and "RELATING TO" shall mean in relation to, related to, consisting of, referring to, reflecting, concerning, discussing, evidencing, commenting on, supporting, contradicting or having any logical or factual connection with the matter identified, in whole or in part.

7. The term "PERSON" shall mean any individual, corporation, organization, association, partnership, enterprise, limited partnership, limited liability company, firm, joint venture, trustee, governmental body, agency, governing board, department or division, or any other entity.

8. The term "IDENTIFY," when used in reference to:

a. A person who is an individual, shall mean to state his or her name, current or last known employer, position, current or last known business or residence address (designating which), and business or residence telephone number (designating which);

b. A person that is a firm, partnership, corporation, proprietorship, association, or other organization or entity shall mean to state the full name and present or last known address and telephone number, the legal form of such entity or organization, and the identity of its chief executive officers; and

4

c.   A DOCUMENT shall mean to state the date thereof and to identify the writer or originator of the DOCUMENT, any persons to whom it was sent, the subject matter dealt with in the DOCUMENT, the present location thereof, and the name(s) of the custodian(s) thereof.

9.      As used herein, the term "FDA" shall mean and refer to the Frente de Defensa de la Amazonia, including FDA's members, partners, contractors, employees, servants, representatives, agents, insurance companies, attorneys, accountants, investigators, assigns, or any other person or entity acting, or purporting to act, on FDA's behalf, either directly or indirectly, including without limitation AmazonWatch, OilWatch and Accion Ecologica.

10.     The phrase SELVA VIVA shall mean the corporation legally established in Ecuador in September 2004 as Selva Viva Selviva Cia Ltda, which is affiliated with FDA and recently declared inactive by Ecuador's Superintendent of Companies.

11.     The phrase "LAGO AGRIO LITIGATION" shall mean and refer to the case of *Maria Aguinda y Otros v. Chevron Corporation*, currently pending in the Provincial Court of Justice of Sucumbíos in Ecuador.

12.     The phrase "AGUINDA LITIGATION" shall mean and refer to the case of *Maria Aguinda et al. v. Texaco Inc.*, No. 93cv7527 (S.D.N.Y.).

13.     The phrase "CALMBACHER" shall mean and refer to Dr. Charles W. Calmbacher and any PERSON assisting him in the LAGO AGRIO LITIGATION, including but not limited to David Russell.

14.     The phrase "CALMBACHER REPORTS" shall mean and refer to the expert reports filed under CALMBACHER's name in the LAGO AGRIO LITIGATION, and any un-filed reports or site inspection performed by, drafted by or attributed to CALMBACHER.

15.     The phrase "GOVERNMENT OF ECUADOR" shall mean any representative, employee, contractor, servant, or any other person or entity, including but not limited to Ecuador's Deputy Attorney General, Martha Escobar, acting, or purporting to act, on behalf, either directly or indirectly, of a governmental body in Ecuador.

16.     The phrase "WORK" shall mean and refer to any writing, analysis, study, report, research, investigation, examination, opinion, ideas, calculation, inference, deduction, assumption, conclusion, technique, testing, sampling, or measuring, including any fieldwork, RELATING TO the LAGO AGRIO LITIGATION.

17.     The Phrase "PLAINTIFF EXPERT(S)" shall mean any PERSON contacted, consulted or retained by the Lago Agrio Plaintiffs or any PLAINTIFF AFFILIATED PERSON to perform WORK RELATING TO the LAGO AGRIO LITIGATION for actual or potential submission to the court in connection with any report or other communication to the court by or in the name of any court-appointed expert, including but not limited to the following PLAINTIFF EXPERTS and the corresponding Judicial Inspection sites:

| | |
|---|---|
| Jennifer Bilbao Garcia | SA-006/SA-021 |
| Charles William Calmbacher | SA-006/SA-021/SA-094/SSF-048 |
| Edison Camino Castro | SA-010/SA-013/SA-051/SA-053/SA-057 |
| Oscar Miguel Davila Benitez | SSF-Suroeste/SSF-Sur/SSF-Norte/SA-014/SA-065 |
| Orlando Manuel Felicita Nato | SA-Sur |
| Xavier Alonso Grandes Zambonino | LA-Norte/SSF-08/SSF-67 |
| Jose Robalino Hidalgo | SA-018/SA-085/SA-Central/SSF-04/SSF-13/LA-02/LA-06/LA-11A/LA-15/SA-Norte 1 |
| Amaury Mauricio Suarez Rivera | SSF-45A/SSF-38 |
| Luis Alberto Villacreces Carvajal | SSF-18/SSF-24/SSF-25/SSF-27/AG Station/LA-Central/GU-06/GU-07/YU-02/AU-01/CO-06 |

Exhibit A to Subpoena

| Francisco Viteri Santamaria | SSF-07/SSF-21/SSF-Central |
| Fabian Alberto Mora Orozco | SSF-25 |

18.     The phrase "PLAINTIFF AFFILIATED PERSON" shall mean and refer to any PERSON directly or indirectly assisting plaintiffs in the LAGO AGRIO LITIGATION including without limitation YOU, the FDA, and SELVA VIVA.

19.     The phrase "YOU" or "YOUR" shall mean and includes yourself and all persons acting in your interest or on your instructions or assisting you, including without limitation your agents, servants, and representatives, including attorneys, accountants, investigators, advisors, environmental consultants, contractors, and medical consultants.

20.     The phrase SETTLEMENT AND RELEASE AGREEMENTS shall mean the following agreements and the performance of any legal obligation or scope of work contained therein:

      a.     Memorandum of Understanding between The Government of Ecuador, Petroecuador and Texaco Petroleum Company, Dec. 14, 1994;

      b.     Contract for Implementing of Environmental Work and Release From Obligations, Liability and Claims between the Republic, Petroecuador and TexPet, May 4, 1995;

      c.     Final Act and Release, Sept. 30, 1998.

21.     As used herein, the singular form of a word shall be interpreted to include the plural form and the plural form shall be interpreted to include the singular whenever appropriate in order to bring within the scope of this request any DOCUMENTS which might otherwise be considered to be beyond its scope.

22.     The term "including" is used without limitation to items or topics not specifically listed.

## INSTRUCTIONS

The following instructions shall govern the response and production of DOCUMENTS:

1.     In the event that any DOCUMENT called for by these Document Requests is withheld on the basis of a claim of privilege, that DOCUMENT is to be identified in a privilege log as follows: author(s), addressees(s), indicated or blind copy recipient(s), date, subject matter, number of pages, attachments or appendices, all persons to whom distributed, shown or explained, the present custodian, and the nature of the privilege asserted.

2.     In the event that any DOCUMENT called for by these Document Requests has been destroyed, discarded, otherwise disposed of, or no longer exists, that DOCUMENT is to be identified as completely as possible, including, without limitation, the following information: author(s), addressee(s), indicated or blind copy recipient(s), date, subject matter, date of disposal, reason for disposal, PERSON authorizing the disposal, and the PERSON disposing of the DOCUMENT and identify its last known location and the reason it is no longer in existence.

3.     In the event that any information is redacted from a DOCUMENT produced pursuant to these Document Requests, that information is to be identified and the basis upon which such information is redacted should be fully stated.

4.     In the event that multiple copies or versions of a DOCUMENT exist, produce all non-identical copies of the DOCUMENT, including any and all drafts of the DOCUMENT.

5.     At the time and place of production of the DOCUMENTS requested herein, the DOCUMENTS requested are to be produced in the same order as maintained in the ordinary course of business.

6.     For each DOCUMENT produced, identify the specific Document Request category to which it is responsive.

7.     For each DOCUMENT produced, identify the office and location where that DOCUMENT was kept prior to this proceeding.

8.     As used herein, the singular form of a word shall be interpreted to include the plural form and the plural form shall be interpreted to include the singular whenever appropriate in order to bring within the scope of this request any DOCUMENTS which might otherwise be considered to be beyond its scope.

## DOCUMENTS TO BE PRODUCED BY YOU

1.     Full and complete copies of all versions of the CALMBACHER REPORTS, including without limitation all exhibits, annexes, attachments, full or partial drafts, whether or not reviewed by CALMBACHER.

2.     All COMMUNICATIONS and DOCUMENTS RELATING TO COMMUNICATIONS involving CALMBACHER, and all WORK, DOCUMENTS and COMMUNICATIONS RELATING TO the CALMBACHER REPORTS, whether or not reviewed or relied upon by CALMBACHER.

3.     Full and complete copies of all versions of WORK prepared by or on behalf of any PLAINTIFF EXPERT in the LAGO AGRIO LITIGATION, including all exhibits, annexes, attachments, and full or partial drafts, whether or not reviewed or relied upon by said experts.

4.     All COMMUNICATIONS and DOCUMENTS RELATING TO COMMUNICATIONS between any PLAINTIFF AFFILIATED PERSON and any PLAINTIFF EXPERT RELATING TO the WORK referenced in number 3, above.

5.      To the extent not covered by number 3 or number 4, above, all DOCUMENTS and COMMUNICATIONS RELATED TO any factual representations, analyses or conclusions in the WORK referenced in number 3, above.

6.      All DOCUMENTS and COMMUNICATIONS relating to the formation, organization or activities of SELVA VIVA.

7.      All DOCUMENTS and COMMUNICATIONS RELATING TO the CRIMINAL INVESTIGATION(S) or CRIMINAL PROCEEDING(S).

8.      All COMMUNICATIONS and DOCUMENTS RELATING TO COMMUNICATIONS between PLAINTIFF AFFILIATED PERSONS and the GOVERNMENT OF ECUADOR RELATING TO the SETTLEMENT AND RELEASE AGREEMENTS, the LAGO AGRIO LITIGATION, or the AGUINDA LITIGATION.

**EXHIBIT B**

EXAMINATION TOPICS

DEFINITIONS

1.      "And" includes the word "or" and vice-versa.

2.      "Any" includes the word "all" and vice-versa.

3.      As used herein, the terms "DOCUMENT" or "DOCUMENTS" shall mean all

COMMUNICATIONS in a tangible form, however produced, reproduced, or stored on any

electronic media, and shall include, but shall not be limited to, the following: all records,

memoranda, reports, financial statements, handwritten and other notes, transcripts, papers,

indices, letters, envelopes, telegrams, cables, telex messages, tabulations, work papers,

timesheets, statements, summaries, opinions, journals, desk calendars, appointment books,

diaries, magazines, newspapers, booklets, circulars, bulletins, notices, instructions, manuals,

notes or summaries of telephone conversations or messages or other COMMUNICATIONS of

any type, video recording, photographs, tape or other recordings, punch cards, discs, data cells,

drums, printouts, and other data compilations from which information can be obtained,

electronically-stored information, correspondence, teletype messages, electronic mail, instant

messages, internal memoranda, agreements, diary entries, minute books, financial records,

accounting records, income tax returns, ledgers, journals, audits, receipts, canceled checks, check

stubs, drafts and other written, deeds, leases, mortgages, assignments, insurance policies, or other

instruments related to real or personal property printed or typed matter, diagrams, plans, pictures,

travel, entertainment, or expense records or reports or any other tangible thing that constitutes

matter. The term "DOCUMENT" and "DOCUMENTS" shall also mean originals and exact

copies or reproductions of all such written, printed, typed, recorded or graphic material or matter

upon which notations or markings in writing, print or otherwise have been made which do not appear in the originals.

4.      The term "COMMUNICATION(S)" shall mean the transmittal of any information by any method and includes all meetings, discussions, telephone conversations, contracts, letters, e-mails, memoranda, correspondence, reports, statements, consultations, negotiations, estimates, purchase orders and any DOCUMENT relating thereto.

5.      The phrase "CRIMINAL INVESTIGATION(S)" or "CRIMINAL PROCEEDING(S)" shall refer to all investigations or other proceedings RELATED TO actual or potential criminal accusations or charges RELATING TO the SETTLEMENT AND RELEASE AGREEMENTS, the LAGO AGRIO LITIGATION, THE AGUINDA LITIGATION or the factual allegations therein. This definition includes without limitation all investigations or other proceedings RELATED TO the following documents:

     a.  Comptroller General of Ecuador Genaro Peña Ugalde's Criminal Complaint filed with the Prosecutor General of Ecuador on October 29, 2003

     b.  Prosecutor General Mariana Yépez Andrade's Order Initiating the Preliminary Investigation for Environmental Crimes and Fraud issued on May 10, 2004

     c.  Prosecutor General of Ecuador Cecelia Armas's Motion to Dismiss the Fraud Charges filed in the Criminal Division of the Supreme Court of Ecuador on August 9, 2006

     d.  Public Prosecutor of Pichincha Marianita Vega Carrera's Motion to Dismiss the Environmental Crimes Charges filed in the Third Criminal Court of Napo on September 4, 2006

e. Order Requesting Comptroller General's Opinion on Prosecutor General Armas's Motion to Dismiss the Fraud Charges issued by the Supreme Court of Justice on October 27, 2006

f. Prosecutor General Jorge German's Motion to Dismiss Criminal Case filed in Supreme Court of Justice on March 1, 2007

g. Comptroller General Carlos Polít Faggioni's Motion Requesting that the Criminal Case Remain Open filed in the Supreme Court of Justice on May 18, 2007

h. Order Requiring Prosecutor General to Reissue Opinion issued by Supreme Court of Justice on June 11, 2007

i. Prosecutor General Jorge German's Motion to Dismiss Criminal Case filed in Supreme Court of Justice on June 14, 2007

j. District Prosecutor Washington Pesántez's Opinion Affirming the Motion to Dismiss the Environmental Crimes Charges (March 13, 2007)

k. Order Dismissing the Environmental Crimes Charges issued by the Third Criminal Court of Napo on March 16, 2007

l. Prosecutor General Washington Pesántez's Notice Reopening the Investigation for Falsification of Public Documents based on New Evidence issued on March 31, 2008

m. Prosecutor General Washington Pesántez's Notice Ordering the Initiation of the Prosecutorial Investigation issued on August 26, 2008

n. Judge Roberto Gómez Mera's Order Noticing the Initiation of the Prosecutorial Investigation issued on September 19, 2008 in the Supreme Court of Justice

Exhibit B to Subpoena

    o.  Prosecutor General Alfredo Alvear Enríquez's Order Adding New Sites to Investigation issued on May 13, 2009

    p.  Environmental Engineer William Bedón's Expert Report Site Inspection filed with the Prosecutor General's Office on August 25, 2009

    q.  Prosecutor General Alfredo Alvear Enríquez's Accusation Opinion of Rodrigo Pérez and Ricardo Veiga issued on April 29, 2010

6.    The phrase "RELATED TO" and "RELATING TO" shall mean in relation to, related to, consisting of, referring to, reflecting, concerning, discussing, evidencing, commenting on, supporting, contradicting or having any logical or factual connection with the matter identified, in whole or in part.

7.    The term "PERSON" shall mean any individual, corporation, organization, association, partnership, enterprise, limited partnership, limited liability company, firm, joint venture, trustee, governmental body, agency, governing board, department or division, or any other entity.

8.    The term "IDENTIFY," when used in reference to:

    a.  A person who is an individual, shall mean to state his or her name, current or last known employer, position, current or last known business or residence address (designating which), and business or residence telephone number (designating which);

    b.  A person that is a firm, partnership, corporation, proprietorship, association, or other organization or entity shall mean to state the full name and present or last known address and telephone number, the legal form of such entity or organization, and the identity of its chief executive officers; and

    c.  A DOCUMENT shall mean to state the date thereof and to identify the writer or originator of the DOCUMENT, any persons to whom it was sent, the subject matter dealt with in the DOCUMENT, the present location thereof, and the name(s) of the custodian(s) thereof.

9.     As used herein, the term "FDA" shall mean and refer to the Frente de Defensa de la Amazonía, including FDA's members, partners, contractors, employees, servants, representatives, agents, insurance companies, attorneys, accountants, investigators, assigns, or any other person or entity acting, or purporting to act, on FDA's behalf, either directly or indirectly, including without limitation AmazonWatch, OilWatch and Accion Ecologica

10.    The phrase SELVA VIVA shall mean the corporation legally established in Ecuador in September 2004 as Selva Viva Selviva Cia Ltda, which is affiliated with FDA and recently declared inactive by Ecuador's Superintendent of Companies.

11.    The phrase "LAGO AGRIO LITIGATION" shall mean and refer to the case of *Maria Aguinda y Otros v. Chevron Corporation*, currently pending in the Provincial Court of Justice of Sucumbíos in Ecuador.

12.    The phrase "AGUINDA LITIGATION" shall mean and refer to the case of *Maria Aguinda et al. v. Texaco Inc.*, No. 93cv7527 (S.D.N.Y.).

13.    The phrase "CALMBACHER" shall mean and refer to Dr. Charles W. Calmbacher and any PERSON assisting him in the LAGO AGRIO LITIGATION, including but not limited to David Russell.

14.    The phrase "CALMBACHER REPORTS" shall mean and refer to the expert reports filed under CALMBACHER's name in the LAGO AGRIO LITIGATION, and any un-filed reports or site inspection performed by, drafted by or attributed to CALMBACHER.

15.     The phrase "GOVERNMENT OF ECUADOR" shall mean any representative, employee, contractor, servant, or any other person or entity, including but not limited to Ecuador's Deputy Attorney General, Martha Escobar, acting, or purporting to act, on behalf, either directly or indirectly, of a governmental body in Ecuador.

16.     The phrase "WORK" shall mean and refer to any writing, analysis, study, report, research, investigation, examination, opinion, ideas, calculation, inference, deduction, assumption, conclusion, technique, testing, sampling, or measuring, including any fieldwork, RELATING TO the LAGO AGRIO LITIGATION.

17.     The phrase "PLAINTIFF EXPERT(S)" shall mean any PERSON contacted, consulted or retained by the Lago Agrio Plaintiffs or any PLAINTIFF AFFILIATED PERSON to perform WORK RELATING TO the LAGO AGRIO LITIGATION for actual or potential submission to the court in connection with any report or other communication to the court by or in the name of any court-appointed expert, including but not limited to the following PLAINTIFF EXPERTS and the corresponding Judicial Inspection sites:

| | |
|---|---|
| Jennifer Bilbao Garcia | SA-006/SA-021 |
| Charles William Calmbacher | SA-006/SA-021/SA-094/SSF-048 |
| Edison Camino Castro | SA-010/SA-013/SA-051/SA-053/SA-057 |
| Oscar Miguel Davila Benitez | SSF-Suroeste/SSF-Sur/SSF-Norte/SA-014/SA-065 |
| Orlando Manuel Felicita Nato | SA-Sur |
| Xavier Alonso Grandes Zambonino | LA-Norte/SSF-08/SSF-67 |
| Jose Robalino Hidalgo | SA-018/SA-085/SA-Central/SSF-04/SSF-13/LA-02/LA-06/LA-11A/LA-15/SA-Norte 1 |
| Amaury Mauricio Suarez Rivera | SSF-45A/SSF-38 |
| Luis Alberto Villacreces Carvajal | SSF-18/SSf-24/SSF-25/SSF-27/AG Station/LA-Central/GU-06/GU-07/YU-02/AU-01/CO-06 |

Exhibit B to Subpoena

| | |
|---|---|
| Francisco Viteri Santamaria | SSF-07/SSF-21/SSF-Central |
| Fabian Alberto Mora Orozco | SSF-25 |

18.    The phrase "PLAINTIFF AFFILIATED PERSON" shall mean and refer to any PERSON directly or indirectly assisting plaintiffs in the LAGO AGRIO LITIGATION including without limitation YOU, the FDA, and SELVA VIVA.

19.    The phrase "YOU" or "YOUR" shall mean and includes yourself and all persons acting in your interest or on your instructions or assisting you, including without limitation your agents, servants, and representatives, including attorneys, accountants, investigators, advisors, environmental consultants, contractors, and medical consultants.

20.    The phrase SETTLEMENT AND RELEASE AGREEMENTS shall mean the following agreements and the performance of any legal obligation or scope of work contained therein:

     a.    Memorandum of Understanding between The Government of Ecuador, Petroecuador and Texaco Petroleum Company, Dec. 14, 1994;

     b.    Contract for Implementing of Environmental Work and Release From Obligations, Liability and Claims between the Republic, Petroecuador and TexPet, May 4, 1995;

     c.    Final Act and Release, Sept. 30, 1998.

21.    As used herein, the singular form of a word shall be interpreted to include the plural form and the plural form shall be interpreted to include the singular whenever appropriate in order to bring within the scope of this request any DOCUMENTS which might otherwise be considered to be beyond its scope.

22.     The term "including" is used without limitation to items or topics not specifically

listed.

TOPICS FOR EXAMINATION

1.     The preparation and filing of the CALMBACHER REPORTS, including any

exhibits, annexes or attachments thereto.

2.     COMMUNICATIONS with CALMBACHER RELATING TO his WORK with

respect to THE LAGO AGRIO LITIGATION.

3.     The preparation of any PLAINTIFF EXPERT's WORK RELATING TO THE

LAGO AGRIO LITIGATION, including any exhibits, annexes or attachments thereto.

4.     COMMUNICATIONS between any PLAINTIFF AFFILIATED PERSON and

any PLAINTIFF EXPERT RELATING TO the WORK referenced in number 3, above.

5.     COMMUNICATIONS RELATED TO any factual representations, analyses or

conclusions in the WORK referenced in number 3, above.

6.     COMMUNICATIONS relating to the formation, organization or activities of

SELVA VIVA.

7.     COMMUNICATIONS RELATING TO the CRIMINAL INVESTIGATION(S)

or CRIMINAL PROCEEDING(S).

8.     COMMUNICATIONS between PLAINTIFF AFFILIATED PERSONS and the

GOVERNMENT OF ECUADOR RELATING TO the SETTLEMENT AND RELEASE

AGREEMENTS, the LAGO AGRIO LITIGATION, or the AGUINDA LITIGATION.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| In re Application of<br><br>**CHEVRON CORPORATION,**<br><br>Applicant,<br><br>To Issue a Subpoena for the Taking of a<br>Deposition and the Production of Documents. | Misc. Action No. _____ |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THE
APPLICATION FOR AN ORDER UNDER 28 U.S.C. § 1782 PERMITTING CHEVRON
CORPORATION TO ISSUE A SUBPOENA FOR THE TAKING OF A DEPOSITION
AND THE PRODUCTION OF DOCUMENTS FROM ALBERTO WRAY**

ANDREA E. NEUMAN
Cal. Bar No. 149733,
*pro hac vice pending*
ANeuman@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
3161 Michelson Drive
Irvine, CA 92612-4412
Telephone: 949.451.3800
Facsimile: 949.451.4220

THOMAS G. HUNGAR
D.C. Bar No. 447783
THungar@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
Telephone: 202.955.8500
Facsimile: 202.467.0539

THOMAS F. CULLEN, JR.
D.C. Bar No. 224733
TFCullen@jonesday.com
LOUIS K. FISHER, D.C. Bar No. 475502
LKFisher@jonesday.com
LUKE A. SOBOTA, D.C. Bar No. 477935
LASobota@jonesday.com
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C.  20001-2113
Telephone: 202.879.3939
Facsimile: 202.626.1700

Attorneys for Chevron Corporation

# TABLE OF CONTENTS

Page

I. INTRODUCTION ...................................................................................................1

II. FACTUAL BACKGROUND...................................................................................5

    A.    The Oil Consortium, The Lago Agrio Litigation, And The Treaty Arbitration ...............................................................................................5

    B.    The Submission Of Fraudulent Expert Reports In The Lago Agrio Litigation ...................................................................................................8

    C.    The Collusion To Bring Sham Criminal Prosecutions Against Chevron Attorneys ................................................................................................12

III. SECTION 1782 ENTITLES CHEVRON TO TAKE DISCOVERY FROM WRAY FOR USE IN BOTH THE LAGO AGRIO LITIGATION AND THE TREATY ARBITRATION ....................................................................................................15

    A.    The Request Meets The Statutory Requirements And Seeks Presumptively Discoverable Evidence .........................................................................15

    B.    Each Of The Four Discretionary Intel Factors Weighs In Favor Of Issuance Of The Requested Subpoena...................................................17

        1.    Wray Is Not a Participant in the Treaty Arbitration and Discovery from Wray is Unlikely in the Lago Agrio Litigation................................18

        2.    UNCITRAL Arbitral Panels and Ecuadorian Courts Are Receptive to Federal Court Assistance Under § 1782 .............................19

        3.    This Application Is an Attempt to Obtain Probative and Relevant Evidence for Two Foreign Proceedings, and in No Way Circumvents Foreign Proof-Gathering Restrictions ...............................20

        4.    The Discovery Requested Is Narrowly Tailored ......................................21

    C.    The Discovery Chevron Seeks Is appropriate And Not Barred By Any Privilege..................................................................................................22

IV. CONCLUSION ...................................................................................................26

# TABLE OF AUTHORITIES

Page

CASES

Aguinda v. Texaco, Inc.,
   142 F. Supp. 2d 534 (S.D.N.Y. 2001) ...................................................................................5

Aguinda v. Texaco, Inc.,
   303 F.3d 470 (2d Cir. 2002) .................................................................................................6

Alexander v. FBI,
   193 F.R.D. 1 (D.D.C. 2000) ...............................................................................................24

Amobi v. D.C. Dep't of Corr.,
   262 F.R.D. 45 (D.D.C. 2009) .............................................................................................23

Evans v. Atwood,
   No. 96-2746, 1999 U.S. Dist. LEXIS 17545 (D.D.C. Sept. 29, 1999).................................22

Great Am. Surplus Lines Ins. Co v. Ace Oil Co.,
   120 F.R.D. 533 (E.D. Cal. 1988).........................................................................................24

In re Application of Noboa,
   Nos. M18-302, M19-111, 1995 U.S. Dist. LEXIS 14402 (S.D.N.Y. Oct. 4, 1995)................20

In re Bayer AG,
   146 F.3d 188 (3d Cir. 1998) ..........................................................................................16, 22

In re Compania Chilena de Navegacion Interoceanica S.A.,
   No. 03 CV 5382, 2004 U.S. Dist. LEXIS 6408 (E.D.N.Y. Jan. 29, 2004).............................19

In re Letter of Request from the Crown Prosecution Serv. of the U.K.,
   870 F.2d 686 (D.C. Cir. 1989).............................................................................................16

In re Letters Rogatory from Tokyo Dist.,
   539 F.2d 1216 (9th Cir. 1976) .............................................................................................23

In re Lindsey,
   158 F.3d 1263 (D.C. Cir. 1998)...........................................................................................24

In re Oxus Gold PLC,
   No. MISC 06-82-GEB, 2007 U.S. Dist. LEXIS 24061 (D.N.J. Apr. 2, 2007).......................19

In re Roz Trading Ltd.,
   469 F. Supp. 2d 1221 (N.D. Ga. 2006).................................................................................19

*In re Roz Trading Ltd.*,
No. 1:06-CV-02305-WSD, 2007 WL 120844 (N.D. Ga. Jan. 11, 2007) ...............................20

*In re Schottdorf*,
No. Civ. M19-88, 2006 U.S. Dist. LEXIS 94161 (S.D.N.Y. Jan. 4, 2007).............................16

*In re Sealed Case*,
146 F.3d 881 (D.C. Cir. 1998)...........................................................................................24

*In re Sealed Case*,
676 F.2d 793 (D.C. Cir. 1982)...........................................................................................25

*In re Sealed Case*,
737 F.2d 94 (D.C. Cir. 1984).............................................................................................24

*In re Sealed Case*,
754 F.2d 395 (D.C. Cir. 1985)...........................................................................................25

*In re Servicio Pan Americano de Proteccion*,
354 F. Supp. 2d 269 (S.D.N.Y. 2004) ...............................................................................18

*Infineon Tech. AG v. Green Power Tech. Ltd.*,
247 F.R.D. 1 (D.D.C. 2005) ..............................................................................................18

*Info. Res., Inc. v. Dun & Bradstreet Corp.*,
999 F. Supp. 591 (S.D.N.Y. 1998).....................................................................................25

*Intel Corp. v. Advanced Micro Devices, Inc.*,
542 U.S. 241 (2004) ...................................................................................................passim

*Jamison v. Miracle Mile Rambler, Inc.*,
536 F.2d 560 (3d Cir. 1976) ..............................................................................................23

*Marubeni Am. Corp. v. LBA Y.K.*,
335 F. App'x 95 (2d Cir. 2009)..........................................................................................18

*Minatec Fin. S.A.R.L. v. SI Group Inc.*,
No. 1:08-CV-269, 2008 U.S. Dist. LEXIS 63802 (N.D.N.Y Aug. 18, 2008)........................21

*Moody v. IRS*,
654 F.2d 795 (D.C. Cir. 1981)...........................................................................................25

*Republic of Ecuador v. ChevronTexaco Corp.*,
376 F. Supp. 2d 334 (S.D.N.Y. 2005) ..............................................................................5, 6

*Ukrnafta v. Carpatsky Petroleum Corp.*,
No. 3:09 MC 265, 2009 U.S. Dist. LEXIS 109492 (D. Conn. Aug. 27, 2009)......................19

*United States v. Philip Morris Inc.*,
    209 F.R.D. 13 (D.D.C. 2002) ............................................................................................22

*United States v. Williams Cos.*,
    562 F.3d 387 (D.C. Cir. 2009)..........................................................................................25

**STATUTES**

28 U.S.C. § 1782 ..............................................................................................................passim

28 U.S.C. § 1782(a) ......................................................................................................4, 15, 23

**OTHER AUTHORITIES**

Fed. R. Civ. P. 26(b)(3)(A)..................................................................................................25

## I.   INTRODUCTION

Under 28 U.S.C. § 1782, "[t]he district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal." Chevron Corporation hereby requests authorization under § 1782 to subpoena Norman Nelson Alberto Wray Espinosa ("Wray") to provide a deposition and documents for use in two proceedings: a lawsuit pending against Chevron in Lago Agrio, Ecuador (the "Lago Agrio Litigation") and an international arbitration brought by Chevron against the Republic of Ecuador under its Bilateral Investment Treaty ("BIT") with the United States (the "Treaty Arbitration").

In recent months, four federal district courts have granted requests by Chevron for § 1782 discovery in aid of the Lago Agrio Litigation and the Treaty Arbitration.[1] Pursuant to the first of those orders, Chevron deposed Dr. Charles W. Calmbacher, a former technical expert for the Lago Agrio plaintiffs. Dr. Calmbacher's testimony supports Chevron's belief that the highly politicized Lago Agrio Litigation—in which Chevron faces the possibility of a $27 *billion* judgment—is fraudulent. Specifically, Dr. Calmbacher testified that two expert reports filed in his name in the Lago Agrio Litigation purport to reach key conclusions—that there was harmful environmental contamination—that Dr. Calmbacher did not reach. According to Dr. Calmbacher, those fabricated reports—and reports submitted in the names of other experts— were prepared in Wray's law office in Ecuador.

---

[1]      *See* Fisher Decl. Ex. 1 (Order, *In re Application of Chevron Corp.*, No. 1:10-mi-00076 (N.D. Ga. Mar. 2, 2010)); *id.* Ex. 2 (Courtroom Minutes, *Chevron Corp. v. Stratus Consulting, Inc.*, No. 1:10-cv-00047 (D. Colo. Mar. 4, 2010)); *id.* Ex. 3 (Order Granting Application Under 28 U.S.C. § 1782, *In re Application of Chevron Corp.*, No. 4:10-mc-134 (S.D. Tex. Apr. 5, 2010)); *id.* Ex. 51 (Memorandum Opinion, *In re Application of Chevron Corp.*, No. M-19-111 (S.D.N.Y. May 10, 2010)). All exhibits cited herein are to the Fisher Declaration filed herewith.

Wray filed the complaint in Lago Agrio in 2003 and was the plaintiffs' lead Ecuadorian counsel until February 2006, when he relinquished primary responsibility for the case while retaining a nominal role as plaintiffs' co-counsel. According to a 2004 organizational memorandum that Wray co-authored, he was the "final authority" for all legal and technical aspects of the plaintiffs' case, and he designated a lawyer in his office to work under his direction in helping edit and draft the expert reports. Through this Section 1782 Application, Chevron is seeking evidence regarding those reports—in particular, evidence showing whether the plaintiffs' representatives withheld, misrepresented, or falsified the data, analysis, or conclusions in those reports, with or without the complicity of the experts themselves. Chevron seeks additional evidence detailing how Dr. Calmbacher's reports were falsified, and who on the plaintiffs' team was involved in or knew of the fraud. Significantly, it appears that plaintiffs' misconduct with regard to judicial inspection reports was not limited to the falsification of Dr. Calmbacher's reports. For example, some of the reports contained chain-of-custody forms stating that samples would be analyzed at the "Selva Viva Laboratory," but Selva Viva is the name that the plaintiffs' representatives gave to a corporation they formed themselves, and to their own technical team.

Chevron also seeks discovery from Wray regarding communications between representatives of the Lago Agrio plaintiffs and officials of the Ecuadorian government. One of Chevron's chief defenses to environmental liability is a release that the Ecuadorian government, acting on behalf of its citizens, granted in exchange for the performance of remediation completed in 1998. Chevron asserts in the Lago Agrio Litigation and in the Treaty Arbitration that its contractual, due process, and treaty rights are being violated by the Ecuadorian government's collusion with the Lago Agrio plaintiffs' lawyers to nullify the release by, *inter*

*alia*, pursuing bogus criminal charges against Chevron's attorneys who executed the agreement. The evidence of this scheme includes an email exchange involving Wray and other representatives of the plaintiffs and the Office of Ecuador's Attorney General. In this exchange, Wray wrote about his interest in having the government "play for our side," and a Deputy Attorney General, Martha Escobar, responded by discussing the Attorney General's efforts "to nullify or undermine" the release and to "criminally try" the Chevron lawyers even though the alleged "evidence of criminal liability [already] was rejected by the prosecutor." Despite the procedural and substantive invalidity of the criminal proceedings discussed in the email, they have progressed to the point where, last month, Ecuador's Prosecutor General sought court approval for the prosecution of the Chevron lawyers and others. Chevron seeks documents and testimony from Wray regarding this email exchange with Escobar, and other communications with her and other Ecuadorian government officials related to the Lago Agrio lawsuit, the attempts to nullify the release, and the related criminal proceedings.

Chevron is seeking further evidence relating to a publicly announced *quid pro quo* between the plaintiffs and the government. This scheme involves a commitment by the plaintiffs not to bring environmental claims against Ecuador or its state oil company, Petroecuador, despite Petroecuador's majority interest in the consortium in which Chevron's subsidiary, Texaco Petroleum Company ("TexPet") participated prior to 1992, and despite Petroecuador's exclusive ownership and operation since 1992 of the oil fields at issue in the Lago Agrio Litigation. The plaintiffs' commitment appears to be connected to an understanding that the state will receive or otherwise benefit from most of any money obtained from Chevron through a judgment or settlement, and that government representatives will use their influence to direct the outcome of the Lago Agrio Litigation or coerce a settlement. As evidenced by the Wray-Escobar e-mail, one

of these tactics is to undermine the prior release and to pressure Chevron through criminal charges against its lawyers. Chevron seeks evidence of other communications that involve the plaintiffs' representatives and show an effort to gain leverage through the government, including through abuse of the criminal process. All of these kinds of evidence, which Wray appears able to provide, are important to Chevron's defense in Lago Agrio, as well as its claims in the Treaty Arbitration.

Like Chevron's other recent applications, which federal courts uniformly have granted, this Application meets each of § 1782's requirements: Wray maintains an office in, and thus can be "found" in, this district; the discovery sought is for "use in" both foreign and international proceedings; and Chevron is an "interested person" in those proceedings. 28 U.S.C. § 1782(a); *see Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 256–59 (2004). Moreover, the four discretionary factors, *see Intel Corp.*, 542 U.S. at 264–65, weigh heavily in favor of granting Chevron's request: Wray is not a participant in the Treaty Arbitration and is unlikely to be subject to discovery in the Lago Agrio Litigation; both foreign tribunals are receptive to U.S.-court assistance; Chevron is not attempting to circumvent proof-gathering restrictions in those tribunals; and the request is neither unduly intrusive nor burdensome.

While a privilege inquiry is premature until any assertion of privilege is made, Chevron is not requesting discovery that would violate any applicable privilege. The information sought by Chevron relates to the falsification of expert reports and related misconduct, and to communications between Wray and third parties, including Ecuadorian government officials. This information is not covered by attorney-client privilege or work-product immunity at a threshold level. Even if it were, discovery would be permissible under the crime-fraud exception that is well accepted in this Circuit. Thus, Wray's status as former or inactive counsel for the

Lago Agrio plaintiffs cannot shield evidence of fraud and collusion. In all events, any attempt by Wray to assert privilege in opposition to this Application would not affect Chevron's right to all non-privileged evidence or prevent appropriate inquiry into the circumstances surrounding the applicability, scope, or waiver of any potential privilege. Thus, because the requirements of § 1782 are clearly met, this Application should be granted

## II.   FACTUAL BACKGROUND

### A.   THE OIL CONSORTIUM, THE LAGO AGRIO LITIGATION, AND THE TREATY ARBITRATION

Between 1974 and 1992, TexPet participated with Petroecuador in a Consortium that explored for and developed oil resources in Ecuador's Oriente region pursuant to a concession granted and overseen by Ecuador's government. *See Republic of Ecuador v. ChevronTexaco Corp.*, 376 F. Supp. 2d 334, 339–40 (S.D.N.Y. 2005); *see also Aguinda v. Texaco, Inc.*, 142 F. Supp. 2d 534, 537, 550–51 (S.D.N.Y. 2001). Petroecuador became the Consortium's sole operator in 1990 and, when the concession expired two years later, took full ownership of the operations in what had been the concession area. *See Republic of Ecuador*, 376 F. Supp. 2d at 340–41.

In connection with winding up TexPet's involvement in the Consortium, TexPet, Ecuador, and Petroecuador negotiated and signed a settlement agreement in which TexPet agreed to remediate specified oil production sites in the former concession area. (*See* Ex. 4 (Contract for Implementing of Environmental Remedial Work and Release from Obligations, Liability and Claims Between the Republic, Petroecuador, and TexPet ("1995 Settlement")).) In return for this work, the Ecuadorian government agreed to give TexPet a complete release from any liability for alleged environmental impacts arising from the Consortium's operations, thereby assuming responsibility for the remediation of all remaining former Consortium sites—many of

5

which Petroecuador continued to use. (*Id.* at 3.) The Ecuadorian government and Petroecuador

inspected and approved TexPet's remediation work, and the three parties executed a final release

in 1998. (*See* Ex. 5 (1998 Final Release).) The Release certified that TexPet had performed all

of its obligations under the Settlement Agreement, and it fully released TexPet from any and all

"legal and contractual obligations and liability for Environmental Impact arising out of the

Consortium's operations." (Ex. 4 at 3 (1995 Settlement); *id.* Ex. 5 at 6 (1998 Final Release));

*see also Republic of Ecuador*, 376 F. Supp. 2d at 342.

A group of U.S. and Ecuadorian lawyers brought the Lago Agrio Litigation against

Chevron in 2003, after the dismissal of a different lawsuit they had pursued against Texaco in

New York. *See Aguinda v. Texaco, Inc.*, 303 F.3d 470 (2d Cir. 2002).[2] Wray, acting as co-

counsel with those lawyers, filed the complaint in the Lago Agrio Litigation on behalf of forty-

eight individual plaintiffs. (*See* Ex. 6 (Compl. entered in the Lago Agrio Record at 3, May 7,

2003).) The complaint does not assert individual claims but rather seeks payment for

remediation of alleged environmental harm that purportedly resulted from the former

Consortium's operations—the same claims settled and released by the Ecuadorian government in

the 1990s. (*Id.*)

Plaintiffs in the Lago Agrio Litigation have not asserted any claims against Petroecuador

or the government of Ecuador—to which Wray has extensive ties.[3] Indeed, Wray's former co-

---

[2]     Texaco had since become a Chevron subsidiary. *See Republic of Ecuador*, 376 F. Supp.
2d at 341.

[3]     Since 2001, Wray has acted as counsel for the Republic of Ecuador in disputes with
foreign investors, and he was representing the Ecuadorian government in three treaty-based
arbitrations at the same time that he was representing the Lago Agrio plaintiffs. (*See* Ex. 7
(listing Wray as counsel for Ecuador in *Duke v. Ecuador*); Ex. 8 (listing Wray as counsel for
[Footnote continued on next page]

counsel, Cristóbal Bonifaz, has stated that the plaintiffs agreed in writing *not* to sue or collect

any judgment against the Republic of Ecuador. (Ex. 10 (*Texaco—The Time Has Come*, Hoy,

Apr. 14, 1997); Ex. 11 (*Petroecuador will not be Damaged*, El Comercio, Apr. 22, 1997).) And

the Ecuadorian government has stated that it plans to receive ninety percent of any judgment

entered against Chevron. (Ex. 12 at 2 (Press Conference with Dr. Washington Pesántez Muñoz,

Prosecutor General of Ecuador, Sept. 4, 2009) ("90 percent [of any judgment against Chevron]

would be split among the State to remediate and bioremediate . . . .").) With their interests

aligned, the government of Ecuador and the Lago Agrio plaintiffs' lawyers have worked together

to circumvent the Settlement Agreement and Release, to hold Chevron financially liable for

Ecuador's environmental cleanup obligations, and to reap the political and financial benefits of a

judgment against Chevron. (*See* Ex. 13 ¶¶ 3–4 (Claimants' Notice of Arbitration, *Chevron Corp.*

*and Texaco Petroleum Co. v. Republic of Ecuador*, Sept. 23, 2009) ("B.I.T. Notice of

Arbitration").) In fact, Ecuador's President Rafael Correa has repeatedly met with plaintiffs'

counsel and advocates—whom he refers to as his "compañeros" (*i.e.*, comrades)—to assure them

that they have the "full support" of Ecuador's "patriotic and sovereign" government in their

lawsuit against the "big transnational compan[y]."[4]

---

[Footnote continued from previous page]
Ecuador in *Empresa v. Ecuador*); Ex. 9 (listing Wray as counsel for Ecuador in *MCI Power v.
Ecuador*).)

[4]      Ex. 14 (*Ecuador Says to Meet Chevron over $16 Bln Lawsuit*, Reuters, Aug. 16, 2008);
Ex. 15 (*Weekly Presidential Address – State TV Channel*, Aug. 9, 2008); Ex. 15 (Press Release,
Government of Ecuador Secretary General of Communications, *The Government Supports the
Actions of Assembly of Parties Affected by Texaco Oil Company*, Mar. 20, 2007) ("The President
of the Republic, Rafael Correa, offered all the support of the National Government to the
Assembly of Parties affected by Texaco Oil Company.").

In September 2009, Chevron and TexPet instituted the Treaty Arbitration against the
Republic of Ecuador under the United Nations Commission on International Trade Law
("UNCITRAL") Rules pursuant to Article VI(3)(a) of the Bilateral Investment Treaty between
the United States and Ecuador. The arbitration claims, for breach of contract and violation of
substantive treaty rights, are largely based on Ecuador's public and private collusion with the
Lago Agrio plaintiffs' counsel to avoid the Settlement Agreement and Release and to use other
illegitimate tactics—including abuse of the criminal justice process, as discussed *infra*
Part II.C—in order to extract money from Chevron. (Ex. 13 (B.I.T. Notice of Arbitration).)

## B.   THE SUBMISSION OF FRAUDULENT EXPERT REPORTS IN THE LAGO AGRIO LITIGATION

The "Judicial Inspection" phase of the Lago Agrio Litigation began in 2004, when the
Lago Agrio court ordered plaintiffs' experts and Chevron's experts to jointly investigate and
report on the environmental conditions at 122 former Consortium production sites. (Ex. 13 ¶ 44
(B.I.T. Notice of Arbitration).) The plaintiffs selected Dr. Calmbacher, a U.S. biologist and
industrial hygienist, to act as their expert for four sites: Sacha 6 ("SA 6"), Sacha 21 ("SA 21"),
Sacha 94 ("SA 94"), and Shushufindi 48 ("SSF 48").[5] On February 14 and March 8, 2005,
judicial inspection reports were filed in Dr. Calmbacher's name for SA 94 and SSF 48,
respectively, each purporting to show extensive environmental damage at those sites.[6] Although

---

[5]     *See* Ex. 47 (JI Acta for SA 6 entered in the Lago Agrio Record at page 8,703, Aug. 18,
2004) (signed by Wray and Calmbacher); Ex. 48 (JI Acta for SA 21 entered in the Lago Agrio
Record at page 8,935, Aug. 19, 2004) (signed by Wray and Calmbacher); Ex. 49 (Request for
Extension by Dr. Charles Calmbacher entered into the Lago Agrio Record at page 11,948, Nov.
11, 2004).)

[6]     Ex. 17 (Calmbacher SA 94 Report, entered in the Lago Agrio Record at page 46,239,
Feb. 14, 2005); Ex. 18 (Calmbacher SSF 48 Report entered in the Lago Agrio Record at page
52,205, Mar. 8, 2005).

the Lago Agrio court ordered Dr. Calmbacher to respond to a series of questions submitted by

Chevron about his sampling and reports, Dr. Calmbacher never responded.[7]

In 2007, the Lago Agrio court prematurely shifted from the judicial inspection process to

a "global" assessment by one appointed "expert"—Richard Cabrera, an Ecuadorian mining

engineer. (Ex. 13 ¶ 47 (B.I.T. Notice of Arbitration); Ex. 22 at 2 (Order entered in Lago Agrio

Record at page 127,044, Mar. 19, 2007).)  Cabrera's assessment parroted plaintiffs' judicial

inspection reports, and he ultimately issued a staggering "damages" recommendation of *$27.4

billion*, based in part on Dr. Calmbacher's reports. (Ex. 23 at 50–54, Annex E at 35, 41, 47, 59

(Supplemental Report of Richard Cabrera entered in the Lago Agrio Record at pages 152,949,

152,998–3,000, 156,084, 153,093, 153,098, 153,110, Nov. 17, 2008).)

In March 2010, Chevron obtained authorization pursuant to § 1782 and deposed

Dr. Calmbacher regarding his role as plaintiffs' expert in the Lago Agrio Litigation. (Ex. 1

(Order, *In re Application of Chevron Corp.*, No. 1:10-mi-00076 (N.D. Ga. Mar. 2, 2010)).)

Dr. Calmbacher testified that before leaving Ecuador in October 2004,[8] he provided portions of a

report that he had begun drafting for the site SA 6 to Wray's office in Quito. (Ex. 24 at 61:19–

23, 72:25– 73:7 (Calmbacher Dep.).)  In November 2004, after he had returned to the United

States, plaintiffs' counsel sent him a report that accurately reflected his findings, and he provided

---

[7]     Ex. 19 at 5 (Brief entered in the Lago Agrio Record at page 79,738, Sept. 20, 2005)
(noting Calmbacher's failure to answer questions for SSF 48); Ex. 20 at 2 (Brief entered in the
Lago Agrio Record at page 79,156, Aug. 31, 2005) (noting Calmbacher's failure to answer
questions for SA 94); Ex. 21 at 1 (Order entered in the Lago Agrio Record at page 80,215, Sept.
30, 2005) (noting no notice address for Calmbacher).

[8]     According to Dr. Calmbacher, he was fired by plaintiffs' U.S. counsel, Donziger, in
October 2004 and returned to the United States shortly thereafter. (Ex. 24 at 85:8–25 (Dep. of
Charles W. Calmbacher, Mar. 29, 2010 ("Calmbacher Dep.")).)

an executed signature page which he understood would be attached to that report. (*Id.* at 114:1–21.) Shortly thereafter, at the request of plaintiffs' counsel, he initialed blank pages and sent them to Ecuador, with the understanding that the report that he had authorized would be printed on those pages. (*Id.* at 61:24–63:23, 114:1–115:14, 118:2–14.) Dr. Calmbacher testified in no uncertain terms that neither of the two reports actually submitted by plaintiffs' counsel with his signature pages attached were the reports he authorized, and that neither reflected his findings. (*Id.* at 112:1–4 ("Q. Is Exhibit 12 the judicial inspection report for Sacha 94 that was filed in Lago Agrio a document that you wrote, sir? A. No, it isn't."); at 116:11–18 ("Q. Okay. Let's take a look at Exhibit 13, which is the document that was submitted to the Court in Lago Agrio as plaintiffs' judicial inspection report for Shushufindi 48. A. Okay. Q. Is Exhibit 13 a document that you wrote, Dr. Calmbacher? A. No, it is not."); at 112:23–113:3 (stating that conclusions in the filed report "are not conclusions that I made"); *see generally* 111:16–117:20.)[9]

These falsified judicial inspection reports—and indeed all of plaintiffs' judicial inspection reports during that time—originated, according to Dr. Calmbacher, at Wray's office in Quito. (*Id.* at 69:4–19; *see also id.* Ex. 25 (Aff. of David Lloyd Russell, Mar. 20, 2006).) Dr. Calmbacher's testimony confirmed that plaintiffs' counsel set up a "report team" based in Wray's office, as stated in a 2004 memo sent by Wray and Steven Donziger, a U.S. lawyer, to the Lago Agrio plaintiffs' "technical team." (Ex. 26 (E-mail from Steven Donziger attaching Memo for Technical Team, Oct. 18, 2004); Ex. 24 at 81:16–84:13 (Calmbacher Dep.); *id.* at

---

[9]    Dr. Calmbacher testified that he had communicated his actual findings to a U.S. lawyer representing the plaintiffs, Steven Donziger, and that Donziger must have known that the reports submitted in his name were fraudulent. (Ex. 24 at 118:15–119:1 (Calmbacher Dep.).)

93:23–94:1 ("Q. So the reports, plaintiffs' judicial inspection reports were actually written in Alberto Wray's offices in Quito; is that fair to say? A. Correct.").) Indeed, according to this memorandum, Wray designated a lawyer in his office to work under his direction to help edit and draft the judicial inspection reports. (Ex. 26 (E-mail from Steven Donziger attaching Memo for Technical Team, Oct. 18, 2004).)

Aside from confirming that the reports originated in Wray's office and were authored under his direction, Dr. Calmbacher's deposition also confirmed other improprieties with judicial inspection reports in Lago Agrio that can be traced to Wray. For example, some of the reports included chain-of-custody forms stating that 100% of the samples would be analyzed at the "Selva Viva Laboratory." (*See, e.g.,* Ex. 67 (Exhibit 8 to the Calmbacher Deposition); Ex. 68 (Exhibit 9 to the Calmbacher Deposition).) Selva Viva is a limited liability company founded in Ecuador in 2004 by Alberto Wray (Ex. 62 (Letter from Wray to Steven Donziger, Oct. 8, 2004)), with its official place of business at the same address as Wray's Quito office. (*Compare* Ex. 63 (Ecuadorian Business Registry for Selva Viva) (listing address as 1240 Shyris, Quito, Ecuador) with Ex. 64 (Cabezas & Wray webpage) (same).) Selva Viva's then-General Manager—Edison Camino Castro—not only coordinated with plaintiffs' attorneys, recruited and monitored plaintiffs' experts, and managed the sampling team in Lago Agrio and the report writing team in Quito, but he was *also* one of plaintiffs' judicial inspection experts. (*See* Ex. 25 (Russell Aff.); Ex. 24 at 36:25-37:12 (Calmbacher Dep.); *see also* Ex. 65 (LA-02 Judicial Inspection Report by Plaintiffs' Expert Robalino, at 16, 22, Figures 1 and 2 pp. 95456 and 95462, Feb. 22, 2006) (referring to "Texaco Samples" and "Selva Viva Samples").) Ultimately, a total of twenty-six judicial inspection reports by plaintiffs' experts were submitted prior to February 7, 2006, when

Wray was replaced as lead Ecuadorian counsel for the plaintiffs. (*See* Ex. 27 (Substitution of Counsel entered in the Lago Agrio Record at page 92,873, Feb. 7, 2006).)[10]

## C.   THE COLLUSION TO BRING SHAM CRIMINAL PROSECUTIONS AGAINST CHEVRON ATTORNEYS

On October 21, 2003, Chevron appeared before the Lago Agrio court in response to the complaint and objected to the lawsuit on a number of legal bases including, *inter alia*, that TexPet, Texaco Inc. and their affiliated companies were already released from all liability for any environmental impact from the Consortium's operations. (Ex. 66 at § II.A. (Answ. to Compl. in Lago Agrio, Oct. 21, 2003).)  Little more than one week later, the Comptroller General of Ecuador submitted a criminal complaint ("*denuncia*") against Chevron lawyers Ricardo Veiga and Rodrigo Pérez, as well as the former Ecuadorian officials who signed the 1998 Release from environmental liability. (Ex. 28 (Criminal Complaint Issued by the Office of the Comptroller General of Ecuador, Oct. 29, 2003).)  The object of these baseless charges was clear: to put pressure on Chevron and to undermine Ecuador's prior Settlement Agreement with TexPet.  This shared motive of Ecuador's government and the Lago Agrio plaintiffs' attorneys was revealed in an August 2005 e-mail exchange between Wray and Martha Escobar, a Deputy Attorney General of Ecuador.

In her e-mail, which was copied to other representatives of the plaintiffs and to Ecuador's Attorney General, Escobar provided Wray with a detailed account of a meeting she had attended in the Office of Ecuador's President regarding Chevron.  Escobar assured Wray that the Attorney

---

[10]   Wray's replacement as lead counsel nominally appointed Wray as one of his co-counsel. (Ex. 52 (Appointment of Co-Counsel entered in the Lago Agrio Record at page 93,244, Feb. 10, 2006).)  But Wray has since signed no documents submitted to the Lago Agrio court, and Chevron's understanding is that his active role in the litigation ceased.  Dr. Calmbacher testified that it was his understanding that Donziger fired Wray. (Ex. 24 at 74:2–4 (Calmbacher Dep.).)

General's office and "all of us working on the State's defense were searching for a way to nullify

or undermine the value of the remediation contract and the [1998 Release]." (Ex. 29 at 1

(Escobar/Wray E-mail Exchange, Aug. 2005).)[11] Escobar also wrote: "The Attorney General

remains resolved to have the Comptroller's Office conduct another audit (that also seems

unlikely to me given the time); he wants to criminally try those who executed the [remediation]

contract (that also seems unlikely to me, since the evidence of criminal liability established by

the Comptroller's Office was rejected by the prosecutor . . . .)." (*Id.* at 1–2.)[12] During the

exchange, Wray wrote that "[i]f at some point we want the Government and the Attorney

General to play for our side, we must give them some ability to maneuver." (*Id.* at 2.)

In 2006, the Prosecutor General and local prosecutors concluded their investigations and

recommended dismissal of both sets of charges stemming from the original complaint. (Ex. 31

(Office of the Prosecutor General of Ecuador, Opinion and Motion to Dismiss, Aug. 9, 2006);

---

[11]    The individuals on the e-mail exchange other than Wray and Escobar, and their positions at the time of the communication, are as follows: (1) Bonifaz—U.S. counsel for plaintiffs and counsel for Ecuador in a separate proceeding pending in the S.D.N.Y.; (2) Luis Yanza—a leader of the Frente de Defensa de la Amazonia, the organization purportedly representing plaintiffs; (3) Manual Pallares—environmentalist and supporter of plaintiffs; (4) Esperanza Martínez—founder of the Ecuadorian environmental organization Acción Ecológica and supporter of plaintiffs; (5) José Maria Borja—Attorney General of Ecuador. The involvement of Martínez is notable because Acción Ecológica apparently played a substantial, undisclosed role in the biased "surveys" upon which a supposedly neutral, court-appointed expert, Richard Cabrera, relied for more than $10 billion of his $27 billion damages recommendation. The direct or indirect involvement of the plaintiffs' representatives in Cabrera's work is facially improper and supports Chevron's defense in Lago Agrio and its claims in the arbitration.

[12]    In a 2006 deposition, Escobar denied that she ever had *any communications* with counsel for the Lago Agrio plaintiffs regarding their lawsuit against Chevron. (Ex. 30 at 18:9–13, 134:7–135:5 (Dep. of Martha Escobar, *Ecuador v. ChevronTexaco Corp.*, No. 04CV8378 (S.D.N.Y. Nov. 21, 2006)).) But when confronted with the e-mail evidence that proved she was lying, she stated that she had been acting per the instructions of the Attorney General. (*Id.* at 158:7–10 ("Q. Did you write the words nullify or undermine? A. Those were the instructions from the Attorney General.").)

Ex. 32 (Office of the Prosecutor General of Ecuador, Opinion and Motion to Dismiss, Sept. 4, 2006); Ex. 33 at 9 (District Prosecutor of Pichincha, Opinion Ratifying Motion to Dismiss, Mar. 13, 2007).)  Later, in response to illegitimate maneuvers designed to keep the charges alive, a second Prosecutor General twice reported that the law required the case file to be closed.  By this time, Ecuador's President Rafael Correa had begun publicly demanding the criminal prosecutions,[13] and the Prosecutor General subsequently was removed from office.  (Ex. 35 art. 8 (Ecuador's Constituent Mandate No. 1, Nov. 29, 2007).)

In 2008, the Lago Agrio plaintiffs' lawyers convened a press conference to call for immediate prosecution of Chevron employees,[14] and they held highly publicized "work[] meeting[s]" with President Correa.[15]  Shortly thereafter, the new Prosecutor General—who, as District Prosecutor, had previously written an opinion supporting the dismissal of the *denuncia* against Chevron's lawyers—initiated the criminal prosecutions that the Lago Agrio plaintiffs' lawyers and Ecuadorian government officials had long pursued.  (Ex. 39 (Office of the Prosecutor General of Ecuador, Criminal Complaint No. 09-2008, Aug. 26, 2008); Ex. 40 (Office of the Prosecutor General of Ecuador, Notification of Criminal Complaint No. 09-2008,

---

[13]     For example, in his April 28, 2007 radio address, President Correa stated: "Chevron Texaco has lawyers defending it, lawyers who sell out their country and are willing to sell their souls. . . . I cordially call on the State Prosecutor to issue a comptroller's report establishing the criminal liability of the  Petroecuador executives who signed that rotten document."  (Ex. 34 at 1 (*Weekly Presidential Address – Radio Caravana*, Apr. 28, 2007).)

[14]     *See* Ex. 36 (*Aguinda Versus Chevron Texaco "Aide-Memoire,"* distributed at a press conference in Quito, Ecuador, July 31, 2008); *see also* Ex. 37 (*Texaco Accused of Risking Negotiations with the United States*, El Comercio, Aug. 1, 2008).

[15]     Ex. 15 (*Weekly Presidential Address – State TV Channel*, Aug. 9, 2008); Ex. 38 (*Weekly Presidential Address – Radio Caravana*, Aug. 16, 2008).

Sept. 3, 2008).)[16] With the exception of a few deleted sentences, the order tracked the language

in the original 2003 *denuncia* word for word. (*Compare* Ex. 39 (Office of the Prosecutor

General of Ecuador, Criminal Complaint No. 09-2008, Aug. 26, 2008), *with* Ex. 28 (Criminal

Complaint Issued by the Office of the Comptroller General of Ecuador, Oct. 29, 2003).) Finally,

on April 29, 2010, the Prosecutor General filed a 133-page accusation with the criminal court,

and if the court accepts the accusation, a preliminary hearing will follow in which the defendants

could be officially indicted for the charged crimes. (Ex. 57 (Accusation Issued by the Office of

the Prosecutor General of Ecuador, Apr. 29, 2010).)

### III.   SECTION 1782 ENTITLES CHEVRON TO TAKE DISCOVERY FROM WRAY FOR USE IN BOTH THE LAGO AGRIO LITIGATION AND THE TREATY ARBITRATION

**A.   THE REQUEST MEETS THE STATUTORY REQUIREMENTS AND SEEKS PRESUMPTIVELY DISCOVERABLE EVIDENCE**

Section 1782 authorizes federal district courts, "upon the application of any interested

person," to order discovery of a "person [who] resides or is found" in the district, "for use in a

proceeding in a foreign or international tribunal." 28 U.S.C. § 1782(a). Those statutory

requirements are met here. First, Wray is found in this District. (Ex. 50 (Profile of Alberto

Wray from the website of Foley Hoag LLP) (stating that "Alberto Wray practices in international

litigation and arbitration in Washington, D.C.").) Second, the discovery Chevron seeks is for use

in foreign and international tribunals, specifically in the Lago Agrio Litigation and the Treaty

Arbitration. Third, as the defendant in the Lago Agrio Litigation and a claimant in the Treaty

---

[16]    In December 2008, the Prosecutor General recused himself, because of his previous involvement in the case, though he did not justify his failure to recuse himself before reinitiating the criminal proceedings. (*See* Ex. 54 (*Prosecutor General Pesantez Recuses Himself in the Chevron-Texaco Case*, Expreso, Dec. 17, 2008); Ex. 55 (*Prosecutor General Recuses Himself in Texaco Case*, El Comercio, Dec. 16, 2008); Ex. 56 (*Prosecutor General Recuses Himself in the Chevron Case*, El Tiempo, Dec. 16. 2008).)

Arbitration, Chevron is an "interested person." *See In re Letter of Request from the Crown Prosecution Serv. of the U.K.*, 870 F.2d 686, 689 (D.C. Cir. 1989) (stating that "interested person" includes "litigants before foreign or international tribunals" (internal quotation marks and citation omitted)). Thus, this Application meets the statutory requirements for discovery under § 1782, and this Court has discretion to grant the requested discovery.

Courts "exercise their discretion under § 1782 in light of the twin aims of the statute: providing efficient means of assistance to participants in international litigation in our federal courts and encouraging foreign countries by example to provide similar means of assistance to our courts." *In re Schottdorf*, No. Civ. M19-88, 2006 U.S. Dist. LEXIS 94161, at *12 (S.D.N.Y. Jan. 4, 2007) (internal quotation marks and citation omitted). These statutory purposes mean that "relevant evidence is presumptively discoverable under Section 1782." *In re Bayer AG*, 146 F.3d 188, 195–96 (3d Cir. 1998).

Evidence regarding the fraudulent creation and submission of the Lago Agrio plaintiffs' expert reports—which were used as part of the basis for the $27 billion assessment of "damages" against Chevron—is clearly relevant to the Lago Agrio Litigation. The specific evidence that Chevron is seeking to discover relates directly to this fraud, *i.e.*, evidence that would confirm and provide detail regarding the falsification of the Calmbacher reports, and reveal whether the plaintiffs' representatives manipulated or fabricated the purported facts and conclusions in other expert reports. The preparation of those reports in Wray's office makes him a key source of evidence on these points.

Similarly, it is central to Chevron's claims in the Treaty Arbitration, and important to Chevron's defense in the Lago Agrio Litigation, that Ecuadorian officials are colluding with the Lago Agrio plaintiffs' representatives to invalidate the Settlement Agreement, to pursue sham

criminal charges against Chevron attorneys, and to steer the outcome in Lago Agrio. (Ex. 13 ¶¶ 34–65 (B.I.T. Notice of Arbitration).) Chevron is seeking additional, direct evidence of this collusion in the form of communications between representatives of the Lago Agrio plaintiffs and the Ecuadorian government on topics including: the Settlement Agreement; the criminal charges and proceedings; the government's public support of the plaintiffs; direct or indirect financial support by the government to the plaintiffs; public or private communications with the Lago Agrio court by current or former government representatives; the government's statements about the Lago Agrio litigation to other governments and outside parties; the plaintiffs' relinquishment of claims against the government; and the distribution and use of any money obtained from Chevron. Because the emails with the Attorney General's office establish that Wray has direct knowledge of plaintiffs' efforts to get the "Government and the Attorney General to play for [their] side" (Ex. 29 at 2 (Escobar/Wray E-mail Exchange, Aug. 2005)), he is in a key position to provide such evidence. Accordingly, the discovery sought here is relevant and proper pursuant to § 1782.

**B.     EACH OF THE FOUR DISCRETIONARY *INTEL* FACTORS WEIGHS IN FAVOR OF ISSUANCE OF THE REQUESTED SUBPOENA**

The Supreme Court has directed district courts to consider four factors in exercising their discretion to grant a § 1782 application: (1) whether "the person from whom discovery is sought is a participant in the foreign proceeding"; (2) the "receptivity" of the foreign tribunal to federal-court assistance; (3) whether the "request conceals an attempt to circumvent foreign proof-gathering restrictions"; and (4) whether the request is "unduly intrusive or burdensome." *Intel Corp.*, 542 U.S. at 264-65. As in the other recent cases where Chevron's § 1782 applications were granted, each of these discretionary factors weighs decisively in favor of granting the requested discovery here.

1.   **Wray Is Not a Participant in the Treaty Arbitration and Discovery from Wray is Unlikely in the Lago Agrio Litigation**

The first discretionary factor under *Intel* asks whether "the person from whom discovery is sought is a participant in the foreign proceeding." *Intel Corp.*, 542 U.S. at 264. Wray is not a participant in the Treaty Arbitration and is not subject to the jurisdiction of the BIT tribunal. Thus, the first *Intel* discretionary factor weighs in favor of granting Chevron's Application.

Discovery is not precluded by the fact that Wray may nominally remain co-counsel for the plaintiffs in the Lago Agrio litigation. Even if Wray might technically be considered a "participant" in the Lago Agrio Litigation, this factor alone does not bar discovery of relevant evidence, and should in fact be given little weight where, as here, Wray has not been actively involved in the Lago Agrio litigation for years and it is not clear that discovery would be readily available in the foreign jurisdiction. *See, e.g.*, *Infineon Tech. AG v. Green Power Tech. Ltd.*, 247 F.R.D. 1, 4 (D.D.C. 2005) (granting discovery under § 1782 from a participant in a foreign proceeding because the remaining three factors supported discovery).[17] In any event, Chevron seeks all of the same information for use in the Treaty Arbitration, in which Wray clearly is not a participant. Even if the first *Intel* factor weighed against discovery for use in the Lago Agrio Litigation, it would weigh in favor of discovery for use in the Treaty Arbitration.

---

[17]   *See also Marubeni Am. Corp. v. LBA Y.K.*, 335 F. App'x 95, 98 (2d Cir. 2009) (affirming grant of discovery under § 1782 because, while the evidence was sought from a participant, it "[wa]s available in the United States and me[t] the statutory requirements for discovery under § 1782(a)"); *In re Servicio Pan Americano de Proteccion*, 354 F. Supp. 2d 269, 270 (S.D.N.Y. 2004) (discounting significance of first *Intel* factor where "the apparent limitations of Venezuelan discovery rules suggest that the exercise of jurisdiction by this Court may be necessary" to obtain the information sought).

2.    **UNCITRAL Arbitral Panels and Ecuadorian Courts Are Receptive to Federal Court Assistance Under § 1782**

The second discretionary factor under *Intel* involves the "receptivity" of the foreign tribunal to federal-court assistance. *See id.* As has already been recognized by other courts in granting Chevron's requests for discovery in connection with these same proceedings, this factor is clearly satisfied here. (*See, e.g.*, Ex. 41 at 6:19–21 (Transcript of Hearing on Subpoenas, *Chevron Corp. v. Stratus Consulting, Inc.*, No. 1:10-cv-00047 (D. Colo. Mar. 4, 2010)) ("[B]oth the Ecuadoran courts and the BIT tribunals historically have been receptive to federal-court assistance under section 1782.").)

Any relevant evidence obtained through this Application can be used in the Treaty Arbitration. *See* UNCITRAL Arbitration Rules art. 24, *available at* http://www.uncitral.org/pdf/english/texts/arbitration/arb-rules/arb-rules.pdf. Indeed, the use of § 1782 in UNCITRAL arbitrations like the Treaty Arbitration is well-accepted. *See, e.g.*, *Ukrnafta v. Carpatsky Petroleum Corp.*, No. 3:09 MC 265, 2009 U.S. Dist. LEXIS 109492 (D. Conn. Aug. 27, 2009); *In re Oxus Gold PLC*, No. MISC 06-82-GEB, 2007 U.S. Dist. LEXIS 24061 (D.N.J. Apr. 2, 2007).[18] Even beyond the four § 1782 orders recently granted in aid of the Lago Agrio Litigation itself, § 1782 has been used to provide discovery for other matters pending in Ecuadorian courts. *See In re Compania Chilena de Navegacion Interoceanica S.A.*, No. 03 CV 5382, 2004 U.S. Dist. LEXIS 6408 (E.D.N.Y. Jan. 29, 2004) (ordering depositions and the

---

[18]    That the Treaty Arbitration is being conducted by an UNCITRAL tribunal distinguishes this case from cases involving purely private arbitrations, where the application of § 1782 has been questioned. (Ex. 51 at 14–15 (Memorandum Opinion, *In re Application of Chevron Corp.*, No. M-19-111 (S.D.N.Y. May 10, 2010) (noting that the "arbitration here at issue is not pending in an arbitral tribunal established by private parties" and concluding that such "international arbitral bodies operating under UNCITRAL rules constitute 'foreign tribunals' for purposes of Section 1782")); *see In re Roz Trading Ltd.*, 469 F. Supp. 2d 1221, 1227 (N.D. Ga. 2006).

production of evidence for an Ecuadorian proceeding); *In re Application of Noboa*, Nos. M18-302, M19-111, 1995 U.S. Dist. LEXIS 14402 (S.D.N.Y. Oct. 4, 1995) (ordering depositions for Ecuadorian probate proceeding). This factor thus also demonstrates that the purposes of § 1782 would be served by granting Chevron's application.[19]

### 3. This Application Is an Attempt to Obtain Probative and Relevant Evidence for Two Foreign Proceedings, and in No Way Circumvents Foreign Proof-Gathering Restrictions

The third discretionary *Intel* factor looks to whether the "request conceals an attempt to circumvent foreign proof-gathering restrictions." *Intel Corp.*, 542 U.S. at 265. Chevron is seeking in good faith discovery that, while not readily available in the ongoing foreign and international proceedings, is not contrary to the rules or policies of those tribunals. This factor likewise supports issuance of the requested subpoena under § 1782.

Section 1782 does not require that the information sought be discoverable under the procedures of the foreign tribunal. *See id.* at 261 ("A foreign nation may limit discovery within its domain for reasons peculiar to its own legal practices, culture, or traditions—reasons that do

---

[19]     The testimony obtained from Dr. Calmbacher pursuant to § 1782 already has been submitted by Chevron in both the Treaty Arbitration and the Lago Agrio Litigation. (*See* Ex. 42 ¶¶ 5, 58 (Claimants' Request for Interim Measures, *Chevron Corp. and Texaco Petroleum Co. v. Republic of Ecuador*, Apr. 1, 2010); *see also* Ex. 43 (Motion to Strike Calmbacher Reports, submitted to the Lago Agrio court on Apr. 14, 2010).) Because there can be no "conten[tion] that [Ecuador] has a policy against accepting the aid of U.S. courts," the actual use that the Ecuador court might make of that and other § 1782 evidence in the highly politicized atmosphere of that case is irrelevant. *In re Roz Trading Ltd.*, No. 1:06-CV-02305-WSD, 2007 WL 120844, at *2 (N.D. Ga. Jan. 11, 2007) ("It is thus proper for this Court to grant a § 1782 request, even if the specific panel deciding the underlying dispute would not order similar discovery or ultimately decides not to accept the specific discovery ordered by this Court."); *see also Intel Corp.*, 542 U.S. at 265 (holding that a § 1782 application could be granted despite the fact that "[t]he European Commission [hearing the underlying matter] has stated in *amicus curiae* briefs to this Court that it does not need or want the District Court's assistance").

not necessarily signal objection to aid from United States federal courts.").[20]  Rather, in determining whether an application is an effort to circumvent foreign proof-gathering restrictions, the consideration for a district court is whether the discovery is being sought in bad faith. *See Minatec Fin. S.A.R.L. v. SI Group Inc.*, No. 1:08-CV-269, 2008 U.S. Dist. LEXIS 63802, at *26 (N.D.N.Y Aug. 18, 2008) ("The primary issue for us is whether [Applicant] is pursuing this discovery in bad faith."). Chevron is unaware of any restrictions in the Treaty Arbitration or the Lago Agrio Litigation that would prohibit the discovery it seeks. No such restriction has been identified in the prior proceedings where Chevron's § 1782 applications were granted. As the Colorado federal district court recently found, "Chevron's discovery requests do not attempt to circumvent foreign proof-gathering restrictions as they are a good-faith effort to obtain probative evidence." (Ex. 41 at 6:21–23 (Transcript of Hearing on Subpoenas, *Chevron Corp. v. Stratus Consulting, Inc.*, No. 1:10-cv-00047 (D. Colo. Mar. 4, 2010)).)

### 4.     The Discovery Requested Is Narrowly Tailored

The fourth discretionary *Intel* factor looks to whether the request is "unduly intrusive or burdensome." *Intel Corp.*, 542 U.S. at 265. The discovery sought in this Application goes to the veracity of the expert reports filed on plaintiffs' behalf—and, by extension, the Cabrera report—and also encompasses communications involving plaintiffs' counsel and the Ecuadorian government regarding the Lago Agrio Litigation and collusion to bring claims or charges against

---

[20]     Although the point is not necessary to satisfy this factor, any relevant evidence developed through § 1782 could be used in the Treaty Arbitration as part of the evidence presented, for direct examination, and/or in the cross examination of witnesses. *See* UNCITRAL Arbitration Rules art. 24, *available at* http://www.uncitral.org/pdf/ english/texts/arbitration/arb-rules/arb-rules.pdf. Likewise, the evidence obtained should be admissible under Ecuadorian law. (*See* Ex. 44 at 1 (2008 Constitution of Ecuador art. 76.7); Ex. 45 (Ecuador Code of Civil Procedure art. 257); Ex. 46 (Ecuador Code of Civil Procedure art. 118).)

Chevron or its attorneys. As set forth above, such discovery is well within the scope of the

Federal Rules and pertinent case law, especially given the significance of the evidence to

Chevron's claims and defenses. "Consistent with the statute's modest prima facie elements and

Congress's goal of providing equitable and efficacious discovery procedures, district courts

should treat relevant discovery materials sought pursuant to § 1782 as discoverable unless the

party opposing the application can demonstrate facts sufficient to justify the denial of the

application." *In re Bayer AG*, 146 F.3d at 195.

**C.     THE DISCOVERY CHEVRON SEEKS IS APPROPRIATE AND NOT BARRED BY ANY PRIVILEGE**

Nothing about Wray's status as former lead counsel and nominal co-counsel for the

plaintiffs affects the granting of this § 1782 Application. Decisions in this district and elsewhere

have recognized that there should be no reluctance to permit a deposition of opposing counsel if

the discovery would not interfere with the attorney's ongoing representation of the client. *See,*

*e.g.*, *United States v. Philip Morris Inc.*, 209 F.R.D. 13, 18 (D.D.C. 2002) (stating that courts

demand a higher showing only for "depositions of trial counsel—or counsel directly representing

the party in the pending litigation—and then *only* if the deposition would reveal litigation

strategy in the pending case").[21]  Because Wray does not appear to play a significant role in

representing plaintiffs in the Lago Agrio Litigation and has not done so for over four years, and

because the subject of the depositions does not relate to current case strategy, there is no risk that

his deposition would disrupt those proceedings, no risk that he would be disqualified, and no risk

---

[21]     *See also Evans v. Atwood*, No. 96-2746, 1999 U.S. Dist. LEXIS 17545, at *10–11 (D.D.C. Sept. 29, 1999) (stating that the concern about disruption is not implicated where the attorney "is not counsel of record and there is nothing to suggest he currently plays a major role" in the litigation").

that he would reveal plaintiffs' current trial strategy. Accordingly, Chevron should be allowed to obtain relevant evidence from Wray.

This Application would be appropriate even if Wray were still actively representing plaintiffs in Lago Agrio. Federal courts grant requests to depose opposing counsel in appropriate circumstances, such as where an attorney is a crucial fact witness, especially when those facts relate to fraudulent litigation practices. *See, e.g., Amobi v. D.C. Dep't of Corr.*, 262 F.R.D. 45, 50–54 (D.D.C. 2009) (permitting the plaintiff to depose an attorney who represented the defendant in arbitration proceeding on issue of whether counsel submitted false documents during arbitration, because information could establish that the plaintiff was deprived of a right to a fair hearing and "[n]o witness can claim immunity as to facts" ); *Jamison v. Miracle Mile Rambler, Inc.*, 536 F.2d 560, 565 (3d Cir. 1976) (permitting the deposition of opposing counsel where plaintiff alleged that defendants committed fraud in reaching the underlying settlement, because it was "difficult [to] comprehend[] how a plaintiff can prepare his case without such discovery"). Given Dr. Calmbacher's testimony that fraudulent expert reports were prepared in Wray's office, and given Wray's participation in email discussions about malicious criminal prosecutions, any higher standard for deposing *current* opposing counsel would be satisfied.

In any event, the requested testimony and communications are not privileged.[22]   Chevron

---

[22]   The discovery that Chevron seeks would not violate "any legally applicable privilege," 28 U.S.C. § 1782(a). Section 1782 applications are typically "received and appropriate action taken . . . *ex parte*," with any privilege issues raised and resolved through a motion to quash made after a subpoena has been authorized and issued. *In re Letters Rogatory from Tokyo Dist.*, 539 F.2d 1216, 1219 (9th Cir. 1976). (*See, e.g.,* Ex. 2 (Courtroom Minutes, *Chevron Corp. v. Stratus Consulting, Inc.*, No. 1:10-cv-00047 (D. Colo. Mar. 4, 2010) (granting the application for subpoenas while providing the opposing party "30 days from the date of service of the subpoenas to file motions to quash"); Ex. 53 (Order, *In re Application of Chevron Corporation*, Misc. No. 4:10-MC-134 (S.D. Tex. Apr. 5, 2010) (granting application *ex parte*, followed two months later [Footnote continued on next page]

seeks information involving communications between Wray and third parties, including

plaintiffs' experts and representatives of the Ecuadorian government. The discovery does not

seek communications between Wray and plaintiffs themselves, and also is not likely to involve

communications based on information from the plaintiffs. Accordingly, the discovery sought is

not subject to the attorney-client privilege. *See In re Lindsey*, 158 F.3d 1263, 1267 (D.C. Cir.

1998) ("The attorney-client privilege protects confidential communications *made between clients*

*and their attorneys* when the communications are for the purpose of securing legal advice or

services." (emphasis added)).[23]

Nor does the work-product doctrine bar access to any of the information Chevron seeks.

In communicating with Wray, the Ecuadorian government was not a representative of the Lago

Agrio plaintiffs and was communicating about, among other things, the abusive criminal

prosecution of Chevron's attorneys. Wray therefore cannot make a requisite showing needed to

support work product immunity: that any documents were produced by an agent of the client in

contemplation of the Lago Agrio Litigation. *See In re Sealed Case*, 146 F.3d 881, 884 (D.C. Cir.

1998). Any work-product protection, moreover, was waived with regard to information Wray

---

[Footnote continued from previous page]
by an unsuccessful motion to quash).) However, given the urgency of Chevron's need for
discovery from Wray, Chevron's § 1782 application is accompanied by an application for an
order to show cause that will, if granted, expedite litigation of any privilege issue that Wray
might raise.

[23]  *See also In re Sealed Case*, 737 F.2d 94, 99 (D.C. Cir. 1984) (stating that the attorney-
client privilege only "cloaks a communication from attorney to client" that is "based, *in part at
least*, upon a confidential communication to the lawyer from the client" (internal quotation
marks, brackets, and citation omitted)); *Alexander v. FBI*, 193 F.R.D. 1, 4–5 (D.D.C. 2000)
(ruling that communications are shielded only "if they rest on confidential information obtained
from the client" (internal quotation marks and citation omitted)); *Great Am. Surplus Lines Ins.
Co v. Ace Oil Co.*, 120 F.R.D. 533, 538 (E.D. Cal. 1988) ("[C]ommunications between an expert
and an attorney are not privileged unless they concern information which emanates directly from
the client.").

shared with third parties, including officials in the Ecuadorian government. *See United States v. Williams Cos.*, 562 F.3d 387, 394 (D.C. Cir. 2009) (stating that "disclosure of work product materials can waive the privilege" if it is "inconsistent with the maintenance of secrecy from the disclosing party's adversary" (internal quotation marks and citation omitted)); *Info. Res., Inc. v. Dun & Bradstreet Corp.*, 999 F. Supp. 591, 593 (S.D.N.Y. 1998) (noting that work product immunity is waived by "the voluntary submission of material to a government agency to incite it to attack the informant's adversary"). Even if work-product protection otherwise applied, it would be overcome by Chevron's substantial need for information about Wray's knowledge of the fraudulent expert reports and collusion with the Ecuadorian government. *See, e.g.*, Fed. R. Civ. P. 26(b)(3)(A).

Finally, any attorney-client privilege or work-product protection "vanishes" here because the crime-fraud exception applies. *In re Sealed Case*, 676 F.2d 793, 812 n.74 (D.C. Cir. 1982). As the D.C. Circuit has held, "an attorney's . . . work product cannot be privileged if the work was performed in furtherance of a crime, fraud or other type of misconduct fundamentally inconsistent with the basic premises of the adversary system." *Id.*; *see also In re Sealed Case*, 754 F.2d 395, 399 (D.C. Cir. 1985) (same for attorney-client privilege); *Moody v. IRS*, 654 F.2d 795, 800 (D.C. Cir. 1981) ("An attorney should not be able to exploit the [work product] privilege for ends outside of and antithetical to the adversary system any more than a client who attempts to use the privilege to advance criminal or fraudulent ends."). Indeed, even if Wray himself was not personally responsible for the fraud, the crime-fraud exception applies, because "a guilty client may not use the innocence or ignorance of its attorney to claim the court's protection." *In re Sealed Case*, 676 F.2d at 812. The discovery sought here relates to the participation of the Lago Agrio plaintiffs' representatives in preparation of fraudulent expert

reports and pursuit of bogus criminal charges.  Because this misconduct is fraudulent and

"fundamentally inconsistent with the basic premises of the adversary system," no privilege could

protect it from disclosure.

## IV.    CONCLUSION

For the foregoing reasons, Chevron respectfully requests leave to serve Wray with the

subpoena attached as Annex A to the Fisher Declaration.

Respectfully Submitted,

Dated:  June 8, 2010

THOMAS F. CULLEN, JR., D.C. Bar No. 224733
TFCullen@jonesday.com
LOUIS K. FISHER, D.C. Bar No. 475502
LKFisher@jonesday.com
LUKE A. SOBOTA, D.C. Bar No. 477935
LASobota@jonesday.com
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C.  20001-2113
Telephone: 202.879.3939
Facsimile: 202.626.1700

ANDREA E. NEUMAN, Cal. Bar No. 149733
*pro hac vice pending*
ANeuman@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
3161 Michelson Drive
Irvine, CA 92612-4412
Telephone: 949.451.3800
Facsimile: 949.451.4220

THOMAS G. HUNGAR, D.C. Bar No. 447783
THungar@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
Telephone: 202.955.8500
Facsimile: 202.467.0539

Attorneys for Chevron Corporation

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**FILED**

JUN 9 - 2010

Clerk, U.S. District and
**Bankruptcy Courts**

In re Application of

**CHEVRON CORPORATION,**

Applicant,

To Issue a Subpoena for the Taking of a
Deposition and the Production of Documents.

Misc. Action No. _____

---

**DECLARATION OF LOUIS K. FISHER IN SUPPORT OF THE APPLICATION FOR
AN ORDER UNDER 28 U.S.C. § 1782 PERMITTING CHEVRON CORPORATION TO
ISSUE A SUBPOENA FOR THE TAKING OF A DEPOSITION AND THE
PRODUCTION OF DOCUMENTS FROM ALBERTO WRAY**

I, Louis K. Fisher, declare as follows:

1.      I am an attorney licensed to practice in the District of Columbia.  I am a partner in

the law firm of Jones Day, counsel of record for Chevron Corporation ("Chevron").  I make this

declaration in support of Chevron's Application For An Order Under 28 U.S.C. § 1782

Permitting Chevron Corporation to Issue A Subpoena For The Taking Of A Deposition And The

Production of Documents From Alberto Wray based on personal knowledge.  If called as a

witness, I could and would testify to the same as stated herein.

2.      Attached hereto as Annex A is a true and correct copy of the draft subpoena

Chevron intends to serve upon Alberto Wray Espinoza upon order of this Court.

3.      Attached hereto as Exhibit 1 is a true and correct copy of an Order, dated March

2, 2010, from *In Re Application of Chevron Corp.*, No. 1:10-mi-00076 (N.D. Ga.).

4.     Attached hereto as Exhibit 2 is a true and correct copy of Courtroom Minutes, dated March 4, 2010, from *Chevron Corp. v. Stratus Consulting, Inc.*, No. 1:10-cv-00047 (D. Colo.).

5.     Attached hereto as Exhibit 3 is a true and correct copy of an Order Granting Application Under 28 U.S.C. § 1782 Permitting Chevron Corporation to Issue a Subpoena for the Taking of a Deposition and the Production of Documents from 3TM, dated April 5, 2010, from *In Re Application of Chevron Corp.*, No. 4:10-mc-134 (S.D. Tex.).

6.     Attached hereto as Exhibit 4 is a true and correct copy of the Contract for Implementing of Environmental Work and Release From Obligations, Liability and Claims between the Republic, Petroecuador and TexPet, sometimes referenced as the "1995 Settlement," and a contemporaneous English translation.

7.     Attached hereto as Exhibit 5 is a true and correct copy of the 1998 Final Release Agreement and a contemporaneous English translation.

8.     Attached hereto as Exhibit 6 is a true and correct copy of the Complaint entered in the Lago Agrio Record on May 7, 2003 in *Aguinda v. ChevronTexaco*, No. 002/2003 (Sup. Court of Justice, Nueva Loja), and its English translation as submitted by the court-appointed translator.

9.     Attached hereto as Exhibit 7 is a true and correct copy of the first page of the Award, dated August 12, 2008, in *Duke Energy Electroquil Partners and Electroquil SA v. Ecuador*, ICSID Case No. ARB/04/19; IIC 333 (2008).

10.     Attached hereto as Exhibit 8 is a true and correct copy of the first page of the

Award, dated June 2, 2009, in *Empresa Eléctrica del Ecuador Inc. v. Ecuador*, ICSID Case No.

ARB/05/9; IIC 376 (2009).

11.     Attached hereto as Exhibit 9 is a true and correct copy of the first page of the

Decision on Annulment, dated October 19, 2009, in *MCI Power Group LC and New Turbine Inc.*

*v. Ecuador*, ICSID Case No. ARB/03/6; IIC 396 (2009).

12.     Attached hereto as Exhibit 10 is a true and correct copy of an article the English

title of which is *Texaco—The Time Has Come*, from Hoy, dated April 14, 1997, and a certified

English translation.

13.     Attached hereto as Exhibit 11 is a true and correct copy of an article the English

title of which is *Petroecuador will not be Damaged* from El Comercio, dated April 22, 1997, and

a certified English translation.

14.     Attached hereto as Exhibit 12 is a true and correct copy of the a transcript of a

September 4, 2009 press conference by Prosecutor General of Ecuador, Dr. Washington Pesántez

Muñoz and a certified English translation.

15.     Attached hereto as Exhibit 13 is a true and correct copy of the Notice of

Arbitration served by Chevron Corporation and Texaco Petroleum Company on the Republic of

Ecuador, dated September 23, 2009.

16.     Attached hereto as Exhibit 14 is a true and correct copy of *Ecuador Says to Meet*

*Chevron over $16 Bln Lawsuit*, from Reuters, Aug. 16, 2008.

3

17.     Attached hereto as Exhibit 15 is a true and correct copy of the transcript of the August 9, 2008 broadcast on the Ecuadorian State TV Channel of a program called *Weekly Presidential Address,* and a certified English translation.

18.     Attached hereto as Exhibit 16 is a true and correct copy of a Press Release, Government of Ecuador Secretary General of Communications, *The Government Supports the Actions of the Assembly of Parties Affected by Texaco Oil Company*, dated March 20, 2007, and a certified English translation.

19.     Attached hereto as Exhibit 17 is a true and correct copy of Charles Calmbacher's Report Regarding Sacha 94 entered in the Lago Agrio Record at page 46,239, dated February 14, 2005, and a certified English translation.

20.     Attached hereto as Exhibit 18 is a true and correct copy of Charles Calmbacher's Report Regarding Shushufindi 48 entered in the Lago Agrio Record at page 52,205, dated March 8, 2005, and a certified English translation.

21.     Attached hereto as Exhibit 19 is a true and correct copy of a Brief entered in the Lago Agrio Record at page 79,738, dated September 20, 2005, and a certified English translation.

22.     Attached hereto as Exhibit 20 is a true and correct copy of a Brief entered in the Lago Agrio Record at page 79,156, dated August 31, 2005, and a certified English translation.

23.     Attached hereto as Exhibit 21 is a true and correct copy of an Order entered in the Lago Agrio Record at page 80,215, dated September, 30, 2005, and a certified English translation.

24.     Attached hereto as Exhibit 22 is a true and correct copy of an Order entered in the Lago Agrio Record at page 127,044, dated March 19, 2007, and a certified English translation.

25.     Attached hereto as Exhibit 23 is excerpts of a true and correct copy of the Supplemental Report of Richard Cabrera entered in the Lago Agrio Record at page 152,949, dated November 17, 2008, and a certified English translation.

26.     Attached hereto as Exhibit 24 is a true and correct copy of the Deposition of Charles W. Calmbacher, dated March 29, 2010.

27.     Attached hereto as Exhibit 25 is a true and correct copy of the Affidavit of David Lloyd Russell, dated March 20, 2006.

28.     Attached hereto as Exhibit 26 is a true and correct copy of an E-mail from Steven Donziger attaching Memo for Technical Team, dated October 18, 2004.

29.     Attached hereto as Exhibit 27 is a true and correct copy of the Substitution of Counsel filed by Alberto Wray in the Lago Agrio Court, dated February 7, 2006, and a certified English translation.

30.     Attached hereto as Exhibit 28 is a true and correct copy of the Criminal Complaint Issued by the Office of the Comptroller General of Ecuador, dated October 29, 2003, and a certified English translation.

31.     Attached hereto as Exhibit 29 is a true and correct copy of an e-mail exchange dated August 2005 between Wray and Martha Escobar, a Deputy Attorney General of Ecuador, *et al.*

32.    Attached hereto as Exhibit 30 is a true and correct copy of excerpts of the
Deposition of Martha Escobar, dated November 21, 2006 from *Republic of Ecuador v.
ChevronTexaco Corp.*, No. 04CV8378 (S.D.N.Y.).

33.    Attached hereto as Exhibit 31 is a true and correct copy of an Opinion and Motion
to Dismiss filed by the Office of the Prosecutor General of Ecuador, dated August 9, 2006, and a
certified English translation.

34.    Attached hereto as Exhibit 32 is a true and correct copy of an Opinion and Motion
to Dismiss filed by the Office of the Prosecutor General of Ecuador, dated September 4, 2006,
and a certified English translation.

35.    Attached hereto as Exhibit 33 is a true and correct copy of an Opinion Ratifying
Motion to Dismiss filed by the District Prosecutor of Pichincha, dated March 13, 2007, and a
certified English translation.

36.    Attached hereto as Exhibit 34 is a true and correct copy of the transcript of the
April 28, 2007 broadcast of a program from Radio Caravana called *Weekly Presidential Address*,
and  a certified English translation.

37.    Attached hereto as Exhibit 35 is a true and correct copy of Ecuador's Constituent
Mandate No. 1, dated November 29, 2007, and a certified English translation.

38.    Attached hereto as Exhibit 36 is a true and correct copy of a document distributed
at a press conference in Quito on July 31, 2008, the translated English title of which is *Aguinda
Versus ChevronTexaco "Aide-Memoire"* and a certified English translation.

6

39.     Attached hereto as Exhibit 37 is a true and correct copy of an article the English title of which is *Texaco Accused of Risking Negotiations with the United States*, from El Comercio, dated August 1, 2008, and a certified English translation.

40.     Attached hereto as Exhibit 38 is a true and correct copy of the transcript of the August 16, 2008 broadcast of a program from Radio Caravana called *Weekly Presidential Address*, and  a certified English translation.

41.     Attached hereto as Exhibit 39 is a true and correct copy of Criminal Complaint No. 09-2008 filed by the Office of the Prosecutor General of Ecuador, dated August 26, 2008.

42.     Attached hereto as Exhibit 40 is a true and correct copy of the Notification of Criminal Complaint No. 09-2008 filed by the Office of the Prosecutor General of Ecuador, dated September 3, 2008.

43.     Attached hereto as Exhibit 41 is a true and correct copy of a Transcript of Hearing on Subpoenas, dated March 4, 2010, from *Chevron Corp. v. Stratus Consulting, Inc.*, No. 1:10-cv-00047 (D. Colo.).

44.     Attached hereto as Exhibit 42 is a true and correct copy of Claimants' Request for Interim Measures dated April 1, 2010, filed in *Chevron Corp. and Texaco Petroleum Co.v. Republic of Ecuador*.

45.     Attached hereto as Exhibit 43 is a true and correct copy of the Motion to Strike the Calmbacher Reports submitted to the Lago Agrio Court on April 14, 2010, and a contemporaneous English translation.

46.     Attached hereto as Exhibit 44 is a true and correct copy of Article 76.7 of the 2008 Ecuador Constitution and a certified English translation.

47.     Attached hereto as Exhibit 45 is a true and correct copy of Article 257 of the Code of Civil Procedure of Ecuador, and a certified English translation.

48.     Attached hereto as Exhibit 46 is a true and correct copy of Article 118 of the Code of Civil Procedure of Ecuador, and a certified English translation.

49.     Attached hereto as Exhibit 47 is a true and correct copy an order entered in the Lago Agrio Record at page 8,703, dated Aug. 18, 2004, and a certified English translation.

50.     Attached hereto as Exhibit 48 is a true and correct copy of an order entered in the Lago Agrio Record at page 8,935, dated Aug. 19, 2004, and a certified English translation.

51.     Attached hereto as Exhibit 49 is a true and correct copy of Request for Extension by Dr. Charles Calmbacher entered in the Lago Agrio Record at page 11,948, dated November 11, 2004, and a certified English translation.

52.     Attached hereto as Exhibit 50 is a true and correct copy of Alberto Wray's profile from the website of Foley Hoag LLP.

53.     Attached hereto as Exhibit 51 is a true and correct copy of the Memorandum Opinion, dated May 10, 2010, from *In re Application of Chevron Corp.*, No. M-19-111 (S.D.N.Y.).

54.     Attached hereto as Exhibit 52 is a true and correct copy of the Appointment of Co-Counsel entered in the Lago Agrio Record at page 93,244, dated Feb. 10, 2006, and a certified English translation.

55.     Attached hereto as Exhibit 53 is a true and correct copy of an Order, dated April 5, 2010, from *In re Application of Chevron Corporation*, Misc. No. 4:10-MC-134 (S.D. Tex.).

56.     Attached hereto as Exhibit 54 is a true and correct copy of an article the English title of which is *Prosecutor General Pesantez Recuses Himself in the Chevron-Texaco Case*, from Expreso, dated December 17, 2008, and a certified English translation.

57.     Attached hereto as Exhibit 55 is a true and correct copy of an article the English title of which is *Prosecutor General Recuses Himself in Texaco Case*, from El Comercio, dated December 16, 2008, and a certified English translation.

58.     Attached hereto as Exhibit 56 is a true and correct copy of an article the English title of which is *Prosecutor General Recuses Himself in the Chevron Case*, from El Tiempo, dated December 16. 2008, and a certified English translation.

59.     Attached hereto as Exhibit 57 is a true and correct copy of the Accusation issued by the Office of the Prosecutor General of Ecuador, dated April 29, 2010.

60.     Attached hereto as Exhibit 58 is a true and correct copy of a hearing transcript, dated March 4, 2010, in *Chevron* v. *Stratus Consulting, Inc.,* Case No. IO-CY-00047 (D. Colo.).

61.     Attached hereto as Exhibit 59 is a true and correct copy of an Order, dated May, 20, 2010, in *In re Chevron Corporation,* S.D.N.Y. Case No. M-19-111 (S.D.N.Y.).

62.     Attached hereto as Exhibit 60 is a true and correct copy of a hearing transcript, dated May 11, 2010, in *Chevron Corporation And Texaco Petroleum Company v. The Republic Of Ecuador,* UNCITRAL Arbitration, PCA Case No. 2009-23.

63.     Attached hereto as Exhibit 61 is a true and correct copy of an Order, dated May 26, 2010, in *In re Application of Chevron Corporation*, Case No. 10-2675 (SRC) (D.N.J.).

64.     Attached hereto as Exhibit 62 is a true and correct copy of a Letter from Alberto Wray to Steven Donziger, dated October 8, 2004, and a certified English translation.

65.     Attached hereto as Exhibit 63 is a true and correct copy of an Ecuadorian Business Registry for Selva Viva, and a certified English translation.

66.     Attached hereto as Exhibit 64 is a true and correct copy of the Cabezas & Wray webpage.

67.     Attached hereto as Exhibit 65 is a true and correct copy of LA-02 Judicial Inspection Report by Plaintiffs' Expert Robalino, entered in the Lago Agrio Record at page 95,440, dated February 22, 2006, and excerpts of a certified English translation.

68.     Attached hereto as Exhibit 66 is a true and correct copy of Chevron's Answer to the Complaint as read into the record on October 21, 2003, entered in the Lago Agrio Record at page 243, and a certified English translation.

69.     Attached hereto as Exhibit 67 is a true and correct copy of Exhibit 8 to the Calmbacher Deposition.

70.     Attached hereto as Exhibit 68 is a true and correct copy of Exhibit 9 to the Calmbacher Deposition.

Respectfully Submitted,

Dated:  June 8, 2010

LOUIS K. FISHER, D.C. Bar No. 475502
LKFisher@jonesday.com
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C.  20001-2113
Telephone: 202.879.3939
Facsimile: 202.626.1700

Attorney for Chevron Corporation